# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 23, 2010       Decided June 22, 2010

No. 09-5172

WILLIAM H. ARMSTRONG,
APPELLANT

v.

TIMOTHY F. GEITHNER, SECRETARY OF THE TREASURY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-01963-JR)

*Kevin E. Byrnes* argued the cause and filed the briefs for appellant.

*Andrea R. Tebbets*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Steven K. Uejio*, Attorney. *Carol Barthel*, Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney, entered appearances.

Before: GINSBURG and GRIFFITH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: William Armstrong sued his former employer, the Department of the Treasury, and several individuals, alleging Treasury employees violated the Privacy Act, 5 U.S.C. § 552a, by disclosing the details of an investigation into his conduct. The district court entered judgment for the defendants because "Armstrong failed to establish that the information [disclosed] ... had been retrieved from a record held in a system of records," as required in an action for damages under the Privacy Act. 610 F. Supp. 2d 66, 68 (2009). We agree and affirm the judgment of the district court.

## I. Background

In 2006 Karen Thompson, one of Armstrong's coworkers at the Office of the Treasury Inspector General for Tax Administration (TIGTA), filed an anonymous complaint against Armstrong. The complaint alleged Armstrong had accessed an investigative database without authorization and had disclosed confidential information he obtained there.

Thompson's complaint triggered an internal investigation, at the opening of which Armstrong was relieved of his badge and law enforcement credentials, denied the use of his government vehicle and computer, and escorted out of the building and driven home. The next day he was reassigned to the Technical and Firearms Support Division.

The investigators ultimately concluded Armstrong had accessed not just the one database, which he admitted doing, but also other databases, without authorization or an official purpose. Because the TIGTA did not immediately close the investigation and impose a sanction, Armstrong was able to

apply for a job at other agencies while still a TIGTA employee.

In 2007 Armstrong applied for and accepted a position within the Office of the Inspector General at the Department of Agriculture; he was to start that September. In mid-August one of Armstrong's coworkers at the TIGTA circulated an email message about a going-away party for him, which alerted the rest of the office to his impending departure.

Shortly before Armstrong was to start his new job, Thompson sent six USDA employees anonymous letters, signed "A Very Concerned Person," with information about the TIGTA's ongoing investigation of Armstrong. In three of those letters, she said hiring Armstrong was "a grave error." Within days the USDA indefinitely postponed Armstrong's start date. He never worked there.[*]

Armstrong later brought this suit against the Secretary of the Treasury, Armstrong's former supervisor, and several unnamed Treasury employees. He alleged various common law torts and six violations of the Privacy Act, one for each letter Thompson had sent to the USDA. When he filed his complaint, however, Armstrong did not know who had written the letters.

Shortly before trial Thompson admitted she had written the letters as well as the anonymous complaint that had

---

[*] In December 2007 Armstrong was removed from his position at the TIGTA. He appealed the removal to the Merit Systems Protection Board, settled for a 30-day suspension instead of removal, and then challenged the settlement. *See Armstrong v. Dep't of the Treasury*, 591 F.3d 1358, 1359–61 (Fed. Cir. 2010).

caused the TIGTA to investigate Armstrong. 610 F. Supp. 2d at 69. At trial she denied, however, getting the information in the letters from any of the TIGTA supervisors involved in the investigation or from records of the investigation; instead she insisted she had based the letters upon independent sources — the rumor mill, her original complaint, and her own observations, assumptions, and speculation.

After trial the district court dismissed the claim against Armstrong's supervisor and entered judgment for the defendants on all other claims. Armstrong appeals only the Privacy Act claims, with respect to which the district court held "Armstrong failed to establish that the information ... had been retrieved from a record held in a system of records—the necessary predicate of his Privacy Act claim." *Id.* at 68.

## II. Analysis

Subject to certain exceptions not relevant here, the Privacy Act prohibits a federal agency from "disclos[ing] any record which is contained in a system of records." 5 U.S.C. § 552a(b). To be actionable, however, a disclosure generally must be the result of someone having actually retrieved the "record" from that "system of records"; the disclosure of information is not ordinarily a violation "merely because the information happens to be contained in the records." *Bartel v. FAA*, 725 F.2d 1403, 1408 (D.C. Cir. 1984).

Armstrong's argument in the district court and on appeal is in the form of the common law tort doctrine, *res ipsa loquitur*; he reasons that information about the investigation must have come from somewhere, could not have come from an unprotected source, and so must have come from a protected source. *See* 610 F. Supp. 2d at 70. Even assuming the logic underlying the common law doctrine applies to the Privacy Act, Armstrong cannot prevail because he cannot

eliminate "other responsible causes." *See* Restatement (Second) of Torts § 328D(1)(b).

We review the district court's factual findings for clear error and its legal conclusions *de novo*. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004). The source of any particular bit of information is a question of fact; whether that source is a "record which is contained in a system of records," 5 U.S.C. § 552a(b), is a question of law.

Armstrong bases his claims upon disclosures of two sorts: (1) disclosures made by Thompson in the six letters she sent to the USDA and (2) disclosures made by other TIGTA employees that indirectly informed Thompson's letters (a/k/a the rumor mill). We review these in turn.[*]

---

[*] Additionally, Armstrong claims Michael Delgado, a supervisor involved in the investigation, disclosed information to a supervisor at the USDA in violation of the Privacy Act. The district court did not address these alleged disclosures because "they go well beyond the allegations [in the] complaint." 610 F. Supp. 2d at 69 n.4. Armstrong does not deny that his complaint alleges no wrongful disclosure by Delgado and that he never moved to amend it to add such allegations. The district court had no obligation to address a claim neither mentioned in nor the subject of a motion to amend the complaint. *See Belizan v. Hershon*, 434 F.3d 579, 582 (D.C. Cir. 2006) (rule providing for leave to amend "applies only when the plaintiff actually has moved for leave to amend the complaint").

Armstrong also suggests in a footnote the district court should not have considered certain evidence when reviewing a motion for partial judgment under Rule 52(c). We need not address an argument raised only cursorily in a footnote. *See Hutchins v. District of Columbia*, 188 F.3d 531, 539–40 n.3 (D.C. Cir. 1999) (en banc).

A.  The Six Letters

The district court held Thompson's letters do not support a claim under the Privacy Act because the information contained in them had not been retrieved from a system of records.  We first consider the district court's factual finding concerning Thompson's sources and then its legal conclusion that no such source was a record retrieved from a system of records.

1.  What Were Thompson's Sources?

The district court found Thompson composed the letters based upon information obtained "from her own complaint, from her own observations and speculation and those of others, from the rumor-mill ... and from other non-covered sources."  610 F. Supp. 2d at 71.  The following table pairs the disclosures in three of Thompson's letters and the sources she identified for each; the other three letters contain substantially the same information and need not be analyzed separately.

| Disclosure | Source(s) |
|---|---|
| (1) The USDA hired "Armstrong to work in the Office of Investigations." | Observation and speculation: That Armstrong was going to the USDA was disclosed in an email message about a going-away luncheon.  As for the specific office, "I presumed that Mr. Armstrong, who was a law enforcement agent with TIGTA, ... would have applied for a position in the Office of |

| | | Investigations because that is where law enforcement agents are employed" at the USDA. |
|---|---|---|
| (2) | Armstrong "was escorted out of the building and forced to turn in his gun, badge, equipment, cell phone, computer and government car keys." | Observation and speculation: "I was there the day that he was removed. ... I heard him leave." "I surmised that it was reasonable to presume that Mr. Armstrong was escorted out of the building, because when individuals are placed under investigation and removed from their position, they are escorted out and driven home." In response to a question about his gun, badge, and cell phone, "I was present that day in the office," and "the office manager, who sits ... outside of Mr. Armstrong's office, ... told me that she saw Mr. Armstrong retrieve his equipment and turn it over." Also, Armstrong parked in the same garage as did Thompson and she observed his government car "never left the parking space." |
| (3) | "He was removed from all managerial and law enforcement duties and sent to another office." | Observation and speculation: Armstrong was Thompson's supervisor "one day and he was not the next day." |
| (4) | He "was under internal investigation for accessing sensitive law enforcement information through | Her own complaint and speculation: "I made the initial anonymous complaint to TIGTA regarding Mr. |

| | various databases." | Armstrong, and shortly thereafter Mr. Armstrong was my supervisor on one day and on the very next day he was no longer my supervisor. I was able to conclude that Mr. Armstrong was likely under investigation for the allegations that I had made." |
|---|---|---|
| (5) | "He admitted to looking up information on his subordinates, co-workers, etc." | Speculation: "In my experience as a federal agent, most people admit to wrongdoing when they are caught." |
| (6) | "At the time the USDA offered [Armstrong] a job, the investigation on him had been completed and the allegations ... were proven to be true." | Speculation: "a sufficient amount of time had passed for me to reasonably conclude that the investigation had been completed." "I believe from my experience working there at TIGTA that had the allegations been disproven, he would have been returned as my supervisor. But he never came back." |
| (7) | "At the time, the Treasury Inspector General for Tax Administration was deciding what disciplinary action (I believe termination was being considered) to take against him." | Speculation: "Based on the seriousness of the allegations contained in the initial anonymous complaint that I made to TIGTA, it was my presumption that an agency would consider termination. Termination is always a consideration as a disciplinary action." |

The district court credited Thompson's testimony regarding her sources and, because Thompson identified a reasonable source for each bit of information, we see no clear error in the district court's findings. Although the district court characterized her as an evasive and unreliable witness, it found no "evidence that Thompson accessed relevant protected records ... or that anyone who did have access disclosed information to her from those records." 610 F. Supp. 2d at 71. Thompson expressly denied having "see[n] any portion of the investigation" or discussed the matter with various supervisors involved in the investigation.

In keeping with his variation of the *res ipsa* theme, Armstrong argues Thompson must have had another source of information, either the agency's "Investigation Records or [] one of the five senior [TIGTA] officials tasked with conducting and safeguarding the report of investigation." We disagree; Armstrong does no more than speculate about another source, whereas each piece of information disclosed in the six letters can be traced back to one of the sources Thompson identified, including plausible inferences she drew from her experience, to the satisfaction of the district court.

2.   Was any Source a Record Under the Act?

We now turn to whether any of the sources Thompson named qualifies as a "record which is contained in a system of records." 5 U.S.C. § 552a(b). The first source, Thompson's own complaint, presents the closest question because it became part of the agency's record of the investigation. The district court, however, found she did not retrieve her complaint from the agency's system of records when composing her letters to the USDA.

Relying upon our opinion in *Bartel v. FAA*, 725 F.2d 1403 (1984), Armstrong argues once Thompson's complaint

became an agency record the Privacy Act prohibited her from repeating its contents. But for the cited decision, this argument might seem far-fetched.

In that case one Bartel, an employee of the Federal Aviation Administration, had apparently accessed agency records improperly, prompting Vincent, another employee, to investigate Bartel's conduct. Vincent collected documents and created a Report of Investigation. Several months later, after learning Bartel was seeking reemployment within the agency, Vincent sent letters to the persons whose files Bartel had accessed, advising them of the investigation and of its findings. 725 F.2d at 1405–06. Bartel sued the FAA under the Privacy Act, arguing the letters disclosed a "record," *viz.*, the Report of Investigation, "contained in a system of records." 5 U.S.C. § 552a(b). The evidence in the case was "entirely silent as to whether Vincent ever examined" — and therefore, actually retrieved — the Report of Investigation before he composed the letters. 725 F.2d at 1408.

We proposed an exception to the general rule requiring the plaintiff to prove a record was actually retrieved, suggesting Vincent may have violated the Privacy Act even if he recalled from memory the contents of the report he had created for inclusion in the agency's record. We narrowly tethered the exception, however, to the facts of that case, in which the disclosing agency employee had "ordered the investigation which resulted in the [report], made a putative determination of wrongdoing based on the investigation, and disclosed that putative determination in letters purporting to report an official agency determination." 725 F.2d at 1411. We also explained that,

> in contrast to disclosures of general office knowledge, it would hardly seem an "intolerable burden" to restrict an

agency official's discretion to disclose information in a record that he may not have read but that he had a primary role in creating and using, where it was because of that record-related role that he acquired the information in the first place.

*Id. Cf. Doe v. Dep't of Veterans Affairs*, 519 F.3d 456, 460–63 (8th Cir. 2008) (distinguishing *Bartel* because doctor who disclosed information in plaintiff's medical record had "learned the information directly from" plaintiff and not from government system for collecting information).

The exception we suggested in *Bartel* does not extend to this case, in which Thompson neither acquired the information contained in her initial complaint in any way related to a record, as an investigator might have done, nor used the record in her work for the agency. Because Armstrong has not shown that Thompson retrieved the record containing her complaint before composing the letters to the USDA, Thompson's disclosure in the letters of information she had also included in her complaint did not violate the Privacy Act.

Nor does a disclosure from any of the other identified sources constitute a violation. There is no evidence Thompson's "observations and speculation" or "those of others," or information "from the rumor-mill," 610 F. Supp. 2d at 71, are part of and were retrieved from any "record which is contained in a system of records."

B.  The Rumor Mill

Concerning the rumor mill, Armstrong states, "The initial disclosure of the information from protected Investigation Records had to start with someone." Drawing upon the district court's observation that the rumor mill "apparently

goes virtually unchecked at TIGTA," 610 F. Supp. 2d at 71; *see also id.* at 68 n.3, Armstrong argues that TIGTA employees with information from the investigation must have unlawfully disclosed that information to other TIGTA employees, effectively feeding the rumor mill. To be sure, a person who fed the rumor mill the contents of a record that had been retrieved from a system of records may have violated the Privacy Act. In order to establish such a violation, however, Armstrong must prove someone disclosed information from a "record," which he has not done.

The Tenth Circuit explained as follows the central difficulty in allegations concerning office rumor mills:

> [T]he mere fact that information ... was well-known in [the] workplace does not give rise to an inference that such knowledge was widespread *because* of a disclosure. ... [T]he Privacy Act does *not* prohibit disclosure of information or knowledge obtained from sources other than 'records.' In particular, it does not prevent federal employees or officials from talking—even gossiping— about anything of which they have non-record-based knowledge.

*Pippinger v. Rubin*, 129 F.3d 519, 530–31 (1997) (citing *Thomas v. Dep't of Energy*, 719 F.2d 342, 345 (10th Cir. 1983)).

Again invoking a version of *res ipsa*, Armstrong argues someone must have violated the Privacy Act because others somehow found out information contained in a covered record. But his conclusion does not follow logically from his premise. First, Armstrong points to no information in the rumor mill that is not found in Thompson's letters to the USDA and, as we have seen, Thompson identified non-covered sources for all the information in those letters.

Although she did identify the rumor mill as one source of information, she also identified another source for each bit of information. Because Thompson got all the information she disclosed from a lawful source other than the rumor mill, Armstrong's argument fails.

Second, Armstrong admitted he himself disclosed some details of the investigation to others. In addition to his wife, he identified five coworkers at the TIGTA and two persons outside the TIGTA with whom he spoke about the investigation.

Armstrong's disclosures to seven professional contacts could easily account for certain details finding their way into the TIGTA rumor mill. *Cf.* Lior Jacob Strahilevitz, *A Social Networks Theory of Privacy*, 72 U. CHI. L. REV. 919 (2005) (explaining why information disclosed to a coworker circulates more widely). Armstrong's mere assertion that the disclosures must have come from a record are not compelling in view of the sources Thompson identified and his own spilling of the beans.

### III. Conclusion

For the foregoing reasons the judgment of the district court is

*Affirmed.*