# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2011      Decided October 28, 2011

No. 10-7007

AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO
ANIMALS, ET AL.,
APPELLANTS

v.

FELD ENTERTAINMENT, INC.,
APPELLEE

———

Consolidated with 10-7021

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:03-CV-02006)

———

*Carter G. Phillips* argued the cause for appellants/cross-appellees. With him on the briefs were *Paul J. Zidlicky*, *Eric D. McArthur*, and *Bryson L. Bachman*. *Katherine A. Meyer*, *Howard M. Crystal*, and *Eric R. Glitzenstein* entered appearances.

*John M. Simpson* argued the cause for appellee/cross-appellant. With him on the briefs were *Jonathan S. Franklin*,

*Michelle C. Pardo*, and *Mark Emery. Joseph T. Small Jr.* entered an appearance.

Before: TATEL, GARLAND, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Feld Entertainment, Inc., owns the country's largest collection of endangered Asian elephants, some of whom travel and perform with its famed Ringling Brothers and Barnum & Bailey Circus. In this case, a former barn helper with Ringling Brothers and an organization dedicated to fighting exploitation of animals allege that not all is well under the big top. Specifically, they claim that Feld's use of two techniques for controlling the elephants—bullhooks and chains—harms the animals in violation of the Endangered Species Act. But the district court never reached the merits of this claim because, following a lengthy bench trial, it found that plaintiffs had failed to establish Article III standing. For the reasons set forth in this opinion, we agree.

# I.

The Endangered Species Act of 1973 (ESA) requires the Secretary of the Interior to identify species that are "endangered" or "threatened." 16 U.S.C. § 1533(a)(1). Section 9 makes it unlawful to "take" any endangered species within the United States, or to "possess, sell, deliver, carry, transport, or ship, by any means whatsoever" any endangered species "taken" in violation of the Act. 16 U.S.C. § 1538(a)(1)(B), (D). The Act defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Pursuant to ESA section 10, the Secretary may issue a permit for a take otherwise prohibited by section 9, provided that he first gives public notice and an opportunity

to comment on the permit application, as well as makes certain findings regarding the impact of the permitted activities. 16 U.S.C. § 1539.

This case involves two techniques Feld uses to handle its Asian elephants. First, its handlers guide and control the elephants with an instrument known as a bullhook, a two- to three-foot rod with a metal point and hook mounted on one end. Second, Feld tethers its Asian elephants with chains when the animals are not performing and when they are traveling by train. Plaintiffs maintain that these two practices "harm," "wound," and "harass" the elephants within the meaning of ESA section 9, and therefore qualify as a "take" which Feld cannot continue without obtaining a section 10 permit.

One of the plaintiffs, Tom Rider, witnessed Feld's use of the challenged practices over two years, from June 1997 to November 1999, when working as a "barn helper" and "barn man" on one of Feld's traveling circus units. His responsibilities included cleaning up after the elephants, giving them food and water, and generally watching over them. Rider claims that during his employment with Feld, he developed a "strong, personal attachment" to the elephants with whom he worked, and that he left his employment with Feld because he could no longer stand to see the elephants mistreated. Compl. ¶¶ 18, 21.

In 2000, Rider and several other individuals and organizations filed suit against Feld, alleging that its use of bullhooks and tethering violated ESA's "take" provision. Concluding that neither Rider nor any other plaintiff had standing to bring suit under ESA's citizen-suit provision, 16 U.S.C. § 1540(g), the district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1).

*Performing Animal Welfare Soc'y v. Ringling Bros. & Barnum & Bailey Circus*, No. 00-cv-01641 (D.D.C. June 29, 2001).

We reversed. *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334 (D.C. Cir. 2003) ("*ASPCA*"). Noting that Rider presented the "strongest case for standing," we began with his allegations. *Id.* at 335. In the complaint, we observed, Rider alleged that during his employment at Feld, he formed a "strong, personal attachment" to the elephants; that he witnessed the elephants exhibiting stress-related, "stereotypic" behavior in response to the use of bullhooks and chains by Feld handlers; and that he ultimately left his job because of this mistreatment. *Id.* (internal quotation marks omitted). Although claiming that he would like to visit the elephants again, Rider alleged that he was unwilling to do so "because he would suffer 'aesthetic and emotional injury' from seeing the animals unless they are placed in a different setting or are no longer mistreated." *Id.*

We found these allegations sufficient to survive Feld's Rule 12(b)(1) motion to dismiss. Relying on our decision in *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) (en banc), we explained that "an injury in fact can be found when a defendant adversely affects a plaintiff's enjoyment of flora or fauna, which the plaintiff wishes to enjoy again upon the cessation of the defendant's actions," and concluded that "the injury Rider allegedly suffers from the mistreatment of the elephants to which he became emotionally attached" could constitute such an injury to his "aesthetic" sense. *ASPCA*, 317 F.3d at 336. Emphasizing the lesser showing required at the pleading stage, we found that Rider's allegations of emotional attachment, coupled with his desire to visit the elephants and

his ability to recognize the effects of mistreatment, were sufficient to establish injury in fact. Causation was never in question—Feld clearly caused the alleged mistreatment—and we reasoned that Rider's injury could be adequately redressed through the lawsuit, assuming the elephants were likely to cease exhibiting signs of stress once the alleged mistreatment ended.

After our decision, Rider and the other plaintiffs dismissed the original action without prejudice and filed a new complaint against Feld. They subsequently filed a supplemental complaint adding another plaintiff, Animal Protection Institute (API), appellant herein, which has advocated against Feld's allegedly abusive treatment of animals since at least 1998. Following rulings on a number of motions not relevant here, the district court held a six-week bench trial, heard testimony from approximately thirty witnesses, reviewed hundreds of documents entered into the evidentiary record, and concluded that both Rider and API had failed to establish standing. Although acknowledging that, pursuant to our *ASPCA* decision, Rider's allegations, if proven, would be sufficient to establish Article III standing, the district court found that Rider was "essentially a paid plaintiff and fact witness" whose trial testimony, and particularly his claim that he had developed an attachment to the elephants, lacked credibility. *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld*, 677 F. Supp. 2d 55, 67 (D.D.C. 2009) ("*ASPCA*"). Based on Rider's lack of credibility and the totality of the evidence presented, the district court concluded that Rider failed to prove the allegations that we had relied upon in finding standing at the pleading stage. *Id.* at 93–94.

The district court also rejected API's two theories of standing. First, API alleged "informational" standing, arguing

that Feld's refusal to seek a permit for activities prohibited by ESA deprived API of information to which it would be entitled in the course of a permit proceeding. The district court rejected this theory on a number of grounds, including that: (1) the statutory basis for API's suit, ESA section 9, imposes no duty on Feld to provide information; (2) even if Feld's practices were deemed a "taking," Feld might decide not to seek a permit, and if it did, the flow of information to API would be controlled by the agency, not Feld; and (3) API already had all of the information it would obtain through the permit process. *Id.* at 97–101.

Second, API argued that it suffered an injury in fact because it had to expend resources to combat Feld's treatment of elephants. The district court rejected this alternative theory of injury because API had failed to present any evidence that it would spend fewer resources on captive animal issues if the use of bullhooks and tethering were declared to be a taking. *Id.* at 101. Because the remaining plaintiffs had abandoned any claim to independent standing, *id.* at 96, the district court entered judgment in favor of Feld, *id.* at 101.

Rider and API appeal. We review the district court's standing determination *de novo*, *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004), and its underlying factual findings for clear error, *Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010); Fed. R. Civ. P. 52(a)(6).

## II.

ESA's citizen-suit provision permits "any person" to commence a civil suit to enjoin alleged violations of the Act or regulations issued under its authority. 16 U.S.C. § 1540(g)(1). Described as "an authorization of remarkable breadth," the citizen-suit provision expands standing to the

full extent permitted under Article III of the Constitution and eliminates any prudential standing requirements. *Bennett v. Spear*, 520 U.S. 154, 164–66 (1997); *ASPCA*, 317 F.3d at 336. To establish standing, then, Rider and API need only satisfy the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That is, they must show (1) an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury is fairly traceable to the defendant's challenged conduct; and (3) that the injury is likely to be redressed by a favorable decision. *Id.* at 560–61 (internal quotation marks omitted).

Because the elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," plaintiffs must support each element of Article III standing "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Although at the pleading stage general factual allegations may suffice to establish standing, "[i]n response to a summary judgment motion . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts." *Id.* (internal quotation marks omitted). Where, as here, standing remains an issue at trial, the plaintiff's burden is higher still: the facts establishing standing must be "supported adequately by the evidence adduced at trial." *Id.* (quotation omitted). In reviewing a district court's standing determination, "the court must be careful not to decide the questions on the merits for or against the plaintiff." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) (quotation omitted). For purposes of this appeal, therefore, we shall assume that the use of bullhooks and tethering amounts to a "take" prohibited by ESA section 9.

With this background in mind, we consider plaintiffs' three theories of standing.

*Tom Rider*

In our prior decision, we held that the allegations in Rider's complaint, if proven, were sufficient to establish standing. Then, following a six-week bench trial, the district court found that Rider failed to credibly prove "the allegations the Court of Appeals had to accept as true at the pleading stage to support Rider's Article III standing to sue." *ASPCA*, 677 F. Supp. 2d at 67.

The district court based its conclusion on extensive findings of fact, as well as its "observations of Mr. Rider on the witness stand over the course of two days." *Id.* at 94. In particular, the district court determined that Rider was "essentially a paid plaintiff and fact witness who is not credible." *Id.* at 67. In support of this finding, the district court observed that Rider complained publicly about the elephants' mistreatment only after he was paid by activists to do so. It is undisputed that between March 2000 and December 2008, Rider received at least $190,000 from the organizational plaintiffs in this lawsuit, as well as from an organization run by plaintiffs' attorneys. Although acknowledging that Rider performed some media and educational outreach work for the organizations during this time, the district court found that the primary purpose for the payments was to keep Rider involved with the litigation. The district court also noted that although these payments constituted Rider's sole income since March 2000, Rider had, in his answers to interrogatories, falsely denied receiving any compensation from the organizational plaintiffs and their counsel. In its detailed memorandum opinion, the district court also found that Rider had referred to one of the elephants as a "bitch" and "killer elephant" who "hated" him;

that he struggled to recall the names of the elephants in two separate depositions; that he had failed to take advantage of multiple opportunities to visit the elephants outside of the circus; and that he was unable to identify the individual elephants on videotape, including one who had the "distinctive and unusual (for an Asian elephant) characteristic of a swayed back." *Id.* at 83–87 (internal quotation marks omitted). The district court observed further that after leaving his employment with Feld, Rider had used a bullhook on elephants at a circus in Europe, casting doubt on his claim that he left the Ringling Brothers circus because he was unable to witness further mistreatment of Asian elephants. Finding that these facts, along with other inconsistencies in Rider's testimony, undermined his credibility, the district court concluded that Rider failed to prove that he had a "personal and emotional attachment" to the seven elephants with whom he worked sufficient to establish injury in fact. *Id.* at 89.

On appeal, Rider seeks to overcome the district court's detailed factual findings and credibility determination by arguing that the district court applied a more stringent legal standard than required by our decisions. Specifically, he argues that the district court required him to prove a "single-minded, all-consuming obsession" with the elephants, Appellants' Br. 46, whereas our case law calls on him to show only that he developed a "personal attachment" to the elephants, *ASPCA*, 317 F.3d at 337, and that he suffered an injury "in a personal and individual way," *Glickman*, 154 F.3d at 433. According to Rider, he satisfied this burden by convincing the district court that he worked closely with Feld's elephants for two-and-a-half years, that he complained to his direct supervisor and elephant handlers about the mistreatment, and that he saw some of the elephants ten to fifteen times per year when he visited the circus as part of his media work. The district court erred, he argues, by going on

to find that if, as Rider testified, he quit his prior circus employment due to elephant abuse, he likely would not have remained in his subsequent employment with Feld for two-and-a-half years; that he failed to complain about the mistreatment to anyone in Feld's management; that he forewent opportunities to visit the elephants outside of the circus; and that it was unlikely that he would have undertaken his media and advocacy efforts had he not been paid to do so by the organizational plaintiffs.

As discussed above, however, the district court's conclusion that Rider failed to credibly prove an emotional attachment to any particular elephant rested on extensive factual findings, including Rider's difficulty recalling the elephants' names, his use of the bullhook in Europe, his lack of forthrightness about payments he received from the organizational plaintiffs, and various inconsistencies in his testimony. The district court prefaced its findings with an accurate discussion of our decision in *ASPCA* and clearly recognized that "an emotional attachment to a particular animal can form the predicate for an aesthetic injury." *ASPCA*, 677 F. Supp. 2d at 89. That the district court relied on facts such as Rider's failure to complain to management hardly suggests that the court believed proof of such facts was required to establish a cognizable injury. Rather, the district court simply found that those facts, taken in the context of the record as a whole, further undermined Rider's credibility and called into question his "personal attachment" to Feld's elephants.

Moreover, no case supports Rider's claim that the district court's findings that he worked with Feld's elephants for two-and-a-half years, made occasional complaints during that time, and subsequently witnessed the elephants performing in the circus are, by themselves, sufficient to establish injury in

fact. Rider cites our decision in *Glickman*, claiming that it holds that a "plaintiff's repeated visits to view animals maintained under inhumane conditions, if true, *established* the personal injury necessary to support Article III standing." Appellants' Br. 44. But it was not the visits alone that established the injury in *Glickman*, but rather the visits together with the plaintiff's claim, accepted as true at that stage of the proceeding, that the inhumane conditions injured his aesthetic sense. 154 F.3d at 431–32. As to this element of standing, the district court disbelieved Rider and found, as a matter of fact, that Rider did not have the personal attachment he claimed and did not, as he claimed, suffer from the elephants' mistreatment. Nothing in these findings reflects an erroneous application of our case law.

Because Rider has failed to show that the district court applied an erroneous legal standard, we are left to review the district court's fact-findings and credibility determination for clear error. *See Armstrong*, 608 F.3d at 857. Under this standard, we may not set aside findings of fact "simply because [we are] convinced that [we] would have decided the case differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). Instead, to find clear error, we must be "left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

Rider points to only one purportedly clear error in the district court's injury analysis—its statement that "[a]fter Mr. Rider left his employment with [Feld] in November 1999, he did not complain to the USDA or to any other animal control authority about the treatment of [Feld's] elephants," *ASPCA*, 677 F. Supp. 2d at 70. According to Rider, this statement constitutes clear error because the record shows that Rider complained to USDA in July 2000. Read in context, however,

the district court's statement is far from clearly erroneous. The court made the challenged statement in the course of a chronological recitation of Rider's history in various circuses, and the statement describes Rider's actions immediately following his departure from Feld and preceding his employment in Europe in December 1999. Rider has never claimed that he contacted USDA during that period. Moreover, as Feld points out, the district court's finding tracks Rider's trial testimony exactly. *See* Trial Tr. at 46 (Feb. 12, 2009 PM) ("Q: And after you left Ringling Brothers, you didn't take any of your concerns about elephant treatment to the USDA, did you? A: No sir."). Given this, we see no basis for finding clear error.

*API—Informational Standing*

In *FEC v. Akins*, the Supreme Court explained that a plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998); *see also Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 449 (1989) (finding that failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"). Following *Akins*, we have recognized that "a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.' " *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (quoting *Akins*, 524 U.S. at 21).

Although API brought this suit under the "take" provision of ESA section 9, its claim to informational standing rests on section 10(c), which requires public disclosure of information contained in permit applications.

Specifically, a party who applies for a permit must provide specified information to the Fish and Wildlife Service, and the Service, in turn, must make that information available to the public. *See* 16 U.S.C. § 1539(c) ("The Secretary shall publish notice in the Federal Register of each application for an exemption or permit which is made under this section. . . . Information received by the Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding."). According to API, because, under its view, Feld's treatment of elephants constitutes a "take" prohibited by section 9, the company cannot lawfully engage in these practices without first applying for and obtaining a permit pursuant to section 10, in which case it will have to submit the information required by that section, information which will then be available to API. This, API argues, gives it informational standing to bring this case. We disagree.

For purposes of informational standing, a plaintiff "is injured-in-fact . . . because he did not get what the statute entitled him to receive." *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 618 (D.C. Cir. 2006); *see also Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008) ("Shays's injury in fact is the denial of information he believes the law entitles him to."). To establish such an injury, a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain. In *Akins*, for example, the plaintiffs challenged the Federal Election Commission's determination that the American Israel Public Affairs Committee (AIPAC) was not a "political committee" as defined by the Federal Election Campaign Act (FECA) and therefore not subject to FECA's disclosure requirements. *Akins*, 524 U.S. at 13. Under plaintiffs' contrary view of the law—that AIPAC's activities rendered it a "political committee"—AIPAC would

be required to disclose information about its donors and contributions, information that plaintiffs would have a right to obtain. *See id.* at 21 ("The 'injury in fact' that respondents have suffered consists of their inability to obtain information—lists of AIPAC donors . . . and campaign-related contributions and expenditures—that, on respondents' view of the law, the statute requires that AIPAC make public."). Because of this, the Supreme Court held, plaintiffs had informational standing to challenge the agency's decision. Were plaintiffs to prevail, AIPAC would have to disclose the information they sought. Similarly, in *Judicial Watch, Inc. v. U.S. Department of Commerce*, the plaintiff alleged that the Department violated the Federal Advisory Committee Act (FACA) reporting requirements by failing to disclose information about its meetings with the North American Competitiveness Council. 583 F.3d 871, 872–73 (D.C. Cir. 2009). Much as in *Akins*, under the plaintiff's view of the law—that the North American Competitiveness Council and its subgroups qualified as "advisory committees" under FACA—the Department would be "subject to an array of FACA obligations" to disclose information about its meetings. *Id.* at 873. Because plaintiff would have a right to this information, we held that it had standing to sue the Department for reporting violations.

This case is very different. As the district court pointed out, unlike the statutes under which plaintiffs sued in *Akins* and *Judicial Watch*, nothing in section 9 gives API a right to any information. If API is correct about section 9—that Feld's use of bullhooks and chains constitutes a prohibited take—then Feld would be obligated to cease those practices, but nothing in section 9, even under API's view, would entitle plaintiffs to any information. True, if Feld wished to recommence the use of bullhooks and chains, it would have to seek a section 10 permit from the Fish and Wildlife Service,

and section 10(c) would then entitle API to obtain the information received by the Service as part of Feld's permit application. *See* 16 U.S.C. § 1539(c). If at that point Feld refused to disclose information in its permit application that API believed the statute required, or if the Fish and Wildlife Service refused to make public the information it received, then API might have informational standing to bring suit for violations of section 10. *Compare Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84–85 (D.C. Cir. 1991) (noting, without deciding the informational standing question, that "[t]he proposition that an organization's desire to supply environmental information to its members, and the consequent 'injury' it suffers when the information is not forthcoming in an [environmental] impact statement, establishes standing *without more* also encounters the obstacle of *Sierra Club v. Morton*, 405 U.S. 727 (1972)"), *with Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 111 (D.D.C. 2009) (finding informational standing where plaintiffs alleged that the Fish and Wildlife Service violated section 10(c) by promulgating a rule that eliminated permit requirements for takings of certain antelope). But here API seeks only to enforce section 9; indeed, a suit under section 10 would be entirely premature.

Attempting to plead around this problem, API characterizes Feld's unlawful conduct as the " 'taking' of elephants without permission from the Fish and Wildlife Service pursuant to the process created by section 10 of the Endangered Species Act." Suppl. Compl. ¶ 6. But ESA proscribes the "take" itself, not the failure to seek a permit, and nothing in the Act entitles the public to information every time a circus or zoo "takes" an endangered animal. In this sense, ESA is quite different from the statutes at issue in both *Akins* and *Judicial Watch*. FECA "imposes extensive recordkeeping and disclosure requirements" in order "to

remedy any actual or perceived corruption of the political process." *Akins*, 524 U.S. at 14. Likewise, FACA "ensure[s] . . . that Congress and the public remain apprised of [advisory committees'] existence, activities, and cost." *Public Citizen*, 491 U.S. at 446. By contrast, ESA's primary purpose is to conserve endangered and threatened species. 16 U.S.C. § 1531(b). It achieves this not by imposing extensive reporting requirements on persons who "take" endangered animals, but rather by prohibiting such "takings." 16 U.S.C. § 1538(a)(1). Section 10's disclosure requirements are secondary to this prohibition, triggered only in the context of an ongoing permit proceeding and intended, not to provide a broad right to information about the activities of any person engaged in a taking, but to allow interested parties to comment on and assist the Secretary's evaluation of permit applications. *See* 16 U.S.C. § 1539(c) (requiring the Secretary to "invite the submission from interested parties . . . of written data, views, or arguments with respect to the [permit] application"). Given the differences between FECA and FACA, on the one hand, and ESA, on the other, we see nothing in *Akins* that would authorize us to extend informational standing to a situation where, as here, the plaintiff's view of the statute would not directly entitle it to the information it seeks.

### *API—*Havens *Standing*

An organization may assert standing on its own behalf or on behalf of its members. *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Here, API claims standing only on its own behalf, in which case it must make the same showing required of individuals: an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision. *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). As the Supreme

Court held in *Sierra Club*, an organization's abstract interest in a problem is insufficient to establish standing, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). This is because "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Accordingly, organizations "who seek to do no more than vindicate their own value preferences through the judicial process" generally cannot establish standing. *Sierra Club*, 405 U.S. at 740; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

In *Havens Realty Corp. v. Coleman*, however, the Supreme Court held that an organization may establish Article III standing if it can show that the defendant's actions cause a "concrete and demonstrable injury to the organization's activities" that is "more than simply a setback to the organization's abstract social interests." 455 U.S. at 379. In *Havens*, the organizational plaintiff, a nonprofit seeking to promote equal opportunity in housing, alleged that Havens Realty Corporation engaged in " 'racial steering' " in violation of the Fair Housing Act. *Id.* at 366. The organization argued that it had standing to sue in its own right because Havens's racial steering practices frustrated its efforts " 'to assist equal access to housing through counseling and other referral services' " and caused the organization to devote resources to identifying and counteracting the unlawful practices. *Id.* at 379 (quoting complaint). Taking these allegations as true, the Supreme Court held that if the organization could show that the steering practices "perceptibly impaired [its] ability to provide counseling and referral services for low- and moderate-income homeseekers,"

such impairment would constitute an injury in fact sufficient to support standing. *Id.* Because "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests," *id.*, the Court distinguished the case from *Sierra Club*, where the organizational plaintiff had alleged nothing more than a "mere interest in a problem," *Sierra Club*, 405 U.S. at 739 (internal quotation marks omitted).

For our part, we "ha[ve] applied *Havens Realty* to justify organizational standing in a wide range of circumstances." *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006). Our case law, however, establishes two important limitations on the scope of standing under *Havens*. *See id.* First, an organization seeking to establish *Havens* standing must show a "direct conflict between the defendant's conduct and the organization's *mission*." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). If the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, we have found it "entirely speculative" whether the challenged practice will actually impair the organization's activities. *Id.* Second, an organization may not "manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Spann*, 899 F.2d at 27. Under our case law, an organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a "self-inflicted" budgetary choice that cannot qualify as an injury in fact for purposes of standing. *Equal Rights Ctr.*, 633 F.3d at 1139–40.

As explained in *Equal Rights Center*, we begin an inquiry into *Havens* standing by asking whether the defendant's

allegedly unlawful activities injured the plaintiff's interest in promoting its mission. *Id.* at 1140. If the answer is yes, we then ask whether the plaintiff used its resources to counteract that injury. *See id.* ("Instead of focusing entirely on the voluntariness of the ERC's diversion of resources, therefore, the district court should have asked, first, whether Post's alleged discriminatory conduct injured the ERC's interest in promoting fair housing and, second, whether the ERC used its resources to counteract that harm.").

Claiming *Havens* standing, API contends that Feld's unlawful conduct undermines its advocacy and public education efforts—"the entire point of which is to put an end to the injury [bullhooks and chains] inflict on the elephants"—by "contributing to the public misimpression, particularly in young children, that bullhooks and chains are lawful and humane practices." Appellants' Br. 27. According to API, it must spend resources on public education, and in gathering and disseminating information about Feld's practices, in order to "counter the misimpression resulting from [Feld's] mistreatment of the elephants." *Id.* at 28. Citing trial testimony of its Senior Vice President and General Counsel, Nicole Paquette, API claims that it spends, independent of the instant litigation, approximately $98,000 per year on circus animal advocacy. API's circus animal advocacy activities include public education through fliers, public-service announcements, and billboards; education and outreach to its members through quarterly letters, "action alerts," and articles in its magazine; drafting legislation and lobbying for measures prohibiting the mistreatment of animals in circuses; and monitoring regulatory processes for information and opportunities to comment on issues relating to circus animals. Paquette testified that most of API's circus animal advocacy efforts are focused on Feld's practices and that it would no longer need to spend "the bulk" of these

resources if Feld no longer had elephants. Trial Tr. at 38 (Feb. 19, 2009 PM).

Feld urges us to reject API's position, arguing that injury to an organization's "advocacy," as opposed to its provision of concrete services or programs, is insufficient to support *Havens* standing. Relying heavily on our decision in *Center for Law & Education v. Department of Education*, 396 F.3d 1152 (D.C. Cir. 2005), Feld argues that " 'to hold that a lobbyist/advocacy group had standing . . . with no injury other than injury to its advocacy would eviscerate standing doctrine's actual injury requirement,' " Appellee's Br. 16 (emphasis omitted) (quoting *Ctr. for Law & Educ.*, 396 F.3d at 1162 n.4), and contends that API lacks standing because " 'the only service' " alleged to be impaired by Feld's practices is " 'pure issue-advocacy,' " Appellee's Br. 21 (quoting *Ctr. for Law & Educ.*, 396 F.3d at 1162). Feld thus draws a sharp distinction between advocacy and other activities, arguing that this case falls on the wrong side of the line.

We are unpersuaded that *Center for Law & Education* so easily ends the inquiry. Although that opinion does contain broad language, it relies on our decision in *National Treasury Employees Union v. United States*, which held only that an effect on an organization's lobbying efforts, absent direct conflict with the organization's mission, was insufficient to establish standing. 101 F.3d at 1430. Much like the plaintiff in *National Treasury Employees Union*, the plaintiffs in *Center for Law & Education* never "challenge[d] the substance" of the federal regulations at issue, 396 F.3d at 1155, arguing instead that the regulations injured them by "forc[ing] them to change their lobbying strategies" to a more expensive, state-by-state approach, *id.* at 1161. In other words, in *Center for Law & Education*, as in *National Treasury Employees Union*

on which it relies, standing failed for lack of a conflict between the challenged conduct and the plaintiffs' stated mission. *Center for Law & Education* says nothing about the situation we face here, where the defendant's conduct is both clearly "at loggerheads" with the organization's mission, *Nat'l Treasury Employees Union*, 101 F.3d at 1429 (quotation omitted), and allegedly injures the organization's advocacy activities.

Moreover, many of our cases finding *Havens* standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are. In *Equal Rights Center*, for instance, we spoke of an injury to the organizational plaintiff's "interest in promoting fair housing." 633 F.3d at 1140. And in *Abigail Alliance*, although recognizing a distinction "between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised," we found that the Alliance had "met this threshold by alleging that it actively engages in counseling, referral, *advocacy*, and educational services." 469 F.3d at 133 (emphasis added) (internal quotation marks omitted). Indeed, API's claims closely mirror those we found sufficient to support standing in *Spann*. There, we concluded that a fair housing organization had standing to sue a condominium owner over discriminatory advertisements, reasoning that the organization might have to expend additional resources on public education to "rebut any public impression the advertisements might generate that racial discrimination in housing is permissible." *Spann*, 899 F.2d at 29. Here, similarly, API claims that it must expend additional resources on public education to rebut the misimpression, allegedly caused by Feld's practices, that the use of bullhooks and chains is permissible.

Ultimately, whether injury to an organization's advocacy supports *Havens* standing remains an open question that we have no need to resolve here. For even assuming API can establish injury in fact, its claim to *Havens* standing falters on causation grounds. Central to API's standing is its allegation that Feld's unlawful practices injure its advocacy and public education efforts because use of bullhooks and chains by the well-known circus creates a public impression, particularly among children, that bullhooks and chains are not harmful to the elephants. This impression, in turn, makes it more difficult—and therefore more expensive—for API to educate the public about the harm inflicted by chains and bullhooks. At oral argument, API maintained that we can draw a "logical inference" that Feld's use of bullhooks and chains creates a public impression that those practices are humane and lawful. Oral Arg. Tr. at 6:20-23. But at this stage of the proceedings, logic is insufficient to establish standing.

As the party invoking federal jurisdiction, API bears the burden of establishing each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561; *see also Equal Rights Ctr.*, 633 F.3d at 1141 n.3 (noting that although "the burden imposed on a plaintiff at the pleading stage is not onerous," that burden "increases . . . as the case proceeds"). Having gone to trial, API bore the burden of proving causation, not through logic, but through "specific facts" supported adequately by testimony or other evidence. *Lujan*, 504 U.S. at 561. To be sure, record evidence establishes not only that API expends resources advocating for the better treatment of elephants, but also that at least some of Feld's advertising budget is used to portray its Asian elephants as healthy and content. But nothing in the record supports the key link in API's standing argument, namely, that Feld's use of bullhooks and chains fosters a public impression that these

practices are harmless. Although Paquette testified extensively about API's advocacy and expenditures, she never mentioned API's efforts to counteract that public impression. And although API put on numerous experts, it failed to provide any expert testimony regarding the effect of Feld's use of bullhooks and chains upon the public's impression of those practices.

Indeed, the only evidence arguably on point comes from Tom Rider, who testified that Feld takes steps to conceal the chains and bullhooks from public view. Specifically, he testified that when Feld exhibits the elephants during an "open house," its employees "pile all the hay on top of the chains" so that the public cannot see them, Trial Tr. at 38 (Feb. 12, 2009 AM), and that when its handlers use bullhooks in circus performances, they "wrap black tape around the hook at the top" so that members of the audience are unable to see it. *Id.* at 46. Contrary to API's claim that Feld's treatment of elephants gives the public the impression that the use of bullhooks and chains is humane, Rider's testimony suggests that the public may in fact have little awareness of these two techniques. True, as counsel pointed out at oral argument, even a limited awareness could lead the public to think that the elephants are happy and content despite the use of bullhooks and chains, but the point—and the one that is fatal to API's standing—is that it has failed to *demonstrate* that Feld's treatment of elephants "contribut[es] to the public misimpression, particularly in young children, that bullhooks and chains are lawful and humane practices." Appellants' Br. 27.

## III.

For the foregoing reasons, API and Rider lack Article III standing to maintain this action. We therefore affirm.

*So ordered.*