# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 14, 2015         Decided August 11, 2015

No. 14-5157

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS,
APPELLANT

v.

UNITED STATES DEPARTMENT OF AGRICULTURE AND
THOMAS J. VILSACK, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF
AGRICULTURE,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00976)

———

*Matthew D. Strugar* argued the cause for the appellant. *Jeffrey S. Kerr* and *Delcianna Winders* were with him on brief.

*William E. Havemann*, Attorney, United States Department of Justice, argued the cause for the appellees. *Ronald C. Machen*, United States Attorney at the time brief was filed, and *Michael J. Singer*, Attorney, were with him on brief.

Before: GARLAND, *Chief Judge*, and HENDERSON and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

*Dubitante* opinion filed by *Circuit Judge* MILLETT.

KAREN LECRAFT HENDERSON, *Circuit Judge*:  In 2004, the United States Department of Agriculture (USDA or Agency) announced that, for the first time, it intended to apply the protections of the Animal Welfare Act (AWA or Act), 7 U.S.C. §§ 2131 *et seq.*, to birds.  Although the Agency has taken steps to craft avian-specific animal welfare regulations, it has yet to complete its task after more than ten years and, during the intervening time, it has allegedly not applied the Act's general animal welfare regulations to birds. Frustrated with the delay, People for the Ethical Treatment of Animals (PETA) sued the USDA, arguing that its inaction amounted to agency action "unlawfully withheld," in violation of section 706(1) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(1).  The district court granted the USDA's motion to dismiss, concluding that the USDA's enforcement decisions are committed by law to its discretion. *See id.* § 701(a)(2).  For the reasons set forth below, we affirm on different grounds.

## I. BACKGROUND

In 1966, the Congress enacted the AWA to, *inter alia*, "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment" and "to assure the humane treatment of animals during transportation in commerce."  7 U.S.C. § 2131(1)–(2).  To effect these goals, the Congress instructed the USDA to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by

dealers, research facilities, and exhibitors." *Id*. § 2143(a)(1). For some animals, the USDA is required by statute to promulgate species-specific regulations, *see id.* § 2143(a)(2)(B) (dogs and primates), and it retains the discretion to promulgate species-specific regulations for other covered animals, *see id.* § 2151. It has done so for, *inter alia*, hamsters, guinea pigs, rabbits and marine mammals. *See* 9 C.F.R. §§ 3.25–3.28; 3.50–3.53; 3.100–3.104. All other animals benefit from the protection of the AWA's general animal welfare regulations, which establish "minimum requirements" for "handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation by species." 7 U.S.C. § 2143(a)(2)(A); *see* 9 C.F.R. §§ 3.125–3.128.

Compliance with the Act and with the USDA's implementing regulations is accomplished through the Act's licensure, inspection and investigation requirements. Its predicate licensure requirement provides that animal "dealer[s]" and "exhibitor[s]" must "obtain[] a license" from the USDA before they "buy, sell, offer to buy or sell, transport or offer for transportation" any "animal." 7 U.S.C. § 2134. Upon receiving an application for licensure from a dealer or exhibitor, the USDA issues a license "in such form and manner as [it] may prescribe." *Id.* § 2133. The Act also allows the USDA to unearth violations of the Act by "mak[ing] such investigations or inspections *as [it] deems necessary*." *Id.* § 2146(a) (emphasis added). It has promulgated regulations providing that, before obtaining a license, "[e]ach applicant must demonstrate that his or her premises and any animals, facilities, vehicles, equipment, or other premises used or intended for use in the business comply with the regulations and standards" set by the USDA and "must make his or her animals, premises, facilities,

vehicles, equipment, other premises, and records available for inspection . . . to ascertain the applicant's compliance with the standards and regulations."  9 C.F.R. § 2.3(a).

Although seemingly broad, the Act's scope turns on the USDA's definition of "animal."  7 U.S.C. § 2132(g).  When first enacted, the AWA protected only "dogs, cats, monkeys (nonhuman primate mammals), guinea pigs, hamsters, and rabbits."  *See* Pub. L. No. 89-544, § 2(h), 80 Stat. 350, 351 (1966).  For years, the USDA excluded birds from the Act's protection.  *See* USDA, Miscellaneous Amendments to Chapter, 36 Fed. Reg. 24,917, 24,919 (Dec. 24, 1971).

Their status changed in 2002, when the Congress amended the AWA's definition of "animal" to *exclude* "birds . . . bred for use in research."  7 U.S.C. § 2132(g).  Interpreting the Congress's *exclusion* of research avians to mean the *inclusion* of all other birds, the USDA updated its regulations on June 4, 2004, to make explicit that birds would thenceforth benefit from the Act's protections.  Animal Welfare; Definition of Animal, 69 Fed. Reg. 31,513, 31,513 (June 4, 2004); *see also* 9 C.F.R. § 1.1.  On the same day it announced that it would apply the Act to birds not bred for use in research, however, the USDA announced that it "d[id] not believe that the general standards" under the AWA, which were promulgated with an eye toward mammalian care, were appropriate for birds.  *See* Animal Welfare; Regulations and Standards for Birds, Rats, and Mice, 69 Fed. Reg. 31,537, 31,539 (June 4, 2004).  The USDA issued an Advance Notice of Proposed Rulemaking (ANPR) for avian-specific animal welfare regulations.  *Id*.

In the ensuing notice-and-comment period, the USDA received over 7,000 comments from a wide range of sources.  Based on the comments, the USDA consulted with

veterinarians, economists, industry members, related government agencies and others to develop a set of avian-specific regulations. It also assigned the Animal and Plant Health Inspection Service (APHIS)—the USDA sub-agency that administers the AWA—to assist with the process. The APHIS then hired an avian health-and-welfare expert to help it accomplish its task.

Despite these efforts, the USDA "has repeatedly set, missed, and then rescheduled deadlines for the publication of proposed bird-specific regulations." *PETA v. USDA (PETA I)*, 7 F. Supp. 3d 1, 6 (D.D.C. 2013). During this time, the USDA has allegedly not applied the AWA's licensure and inspection provisions or the general animal welfare regulations to birds, although it has informally visited facilities accused of avian mistreatment. There is apparently some confusion at the Agency about whether the AWA applies to birds at all. Despite its regulatory pronouncement that birds are AWA-regulated animals, *see* Animal Welfare; Definition of Animal, 69 Fed. Reg. at 31,513, the USDA has responded to some bird-related complaints by insisting that birds are *not* regulated under the AWA and do not fall within the jurisdiction of the USDA. Indeed, the USDA responded to a Freedom of Information Act request by stating that "[a]gency employees conducted a thorough search of their files and advised our office that birds are not being regulated." *PETA I*, 7 F. Supp. 3d at 6.

Frustrated by these representations and by reports of bird-related abuse and neglect, PETA sued the USDA on June 27, 2013, invoking section 706(1) of the APA and requesting the district court to compel the USDA to take two actions it has allegedly "unlawfully withheld," 5 U.S.C. § 706(1). PETA asked the court to "compel[] the USDA to . . . publish for public comment in the Federal Register, by a Court-ordered

deadline, proposed rule(s) specific to birds" and then "promulgate, by a Court-ordered deadline, standards specific to birds." Compl. 7. Second, PETA requested the court to order the USDA to "immediately extend enforcement of the AWA to birds covered by the AWA, by enforcing the general AWA standards that presently exist."[1] The USDA responded with a motion to dismiss (or in the alternative, for summary judgment), arguing, first, that PETA lacked standing and, second, that PETA failed to state a claim because the AWA leaves enforcement decisions to the USDA's non-justiciable discretion.

The district court rejected the USDA's standing argument. Recognizing that "an organizational plaintiff such as PETA [can] sue in its own right," *PETA I*, 7 F. Supp. 3d at 7, the district court found that PETA suffered two cognizable injuries. First, unless the USDA applied the AWA's protections to birds, PETA could not redress bird mistreatment by filing complaints with the USDA and, as a result, PETA had to expend resources to seek relief through other, less efficient and effective means. Second, the USDA's failure to protect birds meant, *ipso facto*, that the USDA was not creating bird-related inspection reports that PETA could use to raise public awareness. Finding that "[t]hese are real, concrete obstacles to PETA's work," *id*., the district court also concluded that PETA had demonstrated the requisite causation and redressability, *id.* at 9.

---

[1] The district court denied PETA's requested mandatory injunctive relief requiring the USDA to promulgate bird-specific AWA regulations. *See PETA I*, 7 F. Supp. 3d at 13–15. PETA has abandoned that argument on appeal.

The district court nonetheless dismissed PETA's suit, concluding that PETA failed to state a claim because "individual decisions by USDA not to enforce the AWA with respect to particular avian incidents . . . are unreviewable [as] 'committed to agency discretion by law.' " *Id.* at 13 (quoting 5 U.S.C. § 701(a)(2)). It rejected PETA's arguments that the AWA sufficiently constrained the USDA's discretion to make its enforcement decisions justiciable and that the USDA's alleged policy of non-enforcement, under D.C. Circuit law, could be challenged in court. Regarding the former, the court reasoned that the AWA gave the USDA broad discretion to conduct "investigations or inspections as *[it] deems necessary*." *Id.* at 11 (emphasis in original). On the latter, the court faulted PETA's failure to "identify any concrete statement from USDA announcing a general policy not to regulate birds under the AWA" and credited the USDA's "expressed . . . official position on the matter" in its "regulations bringing birds under the scope of the AWA." *Id*. at 12 (quotation marks omitted).[2] PETA moved for reconsideration or, in the alternative, to amend its complaint, both of which motions the district court denied. PETA then filed a timely notice of appeal.

## II. ANALYSIS

We review the district court's dismissal *de novo*, "treat[ing] the complaint's factual allegations as true and . . . grant[ing] [PETA] the benefit of all inferences that can be

---

[2] The district court did, however, comment that the "USDA would . . . be well advised to educate its officials on the agency's policy regarding birds—namely, that birds *are* regulated by the AWA and *do* fall under the agency's enforcement jurisdiction—and to ensure that they break their bad habit of misinforming the public on this matter." *PETA I*, 7 F. Supp. 3d at 12 (emphases in original).

derived from the facts alleged." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314–15 (D.C. Cir. 2014) (some alteration in original). We need not, however, accept the truth of "a legal conclusion couched as a factual allegation." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006). To avoid dismissal, PETA must plead "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

PETA has not alleged that the USDA's delay in enforcing the AWA with regard to birds is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). *See* Compl. 6–7. And on appeal, PETA has abandoned its effort to require the USDA to promulgate bird-specific regulations, *see* Appellant's Br. 25; Oral Arg. Recording 14:22–15:50, and does not pursue the allegation made in its complaint that the USDA "unreasonably delayed" enforcement of its general animal welfare regulations with regard to birds, in violation of section 706(1) of the APA, *see* Reply Br. 32–33. The only question before us, then, is whether PETA's complaint states a claim that the USDA's alleged policy of not enforcing the general regulations with respect to birds—without regard to the reasonableness *vel non* of the delay in enforcement—constitutes agency action "unlawfully withheld," in violation of section 706(1) of the APA. Before reaching that question, however, we must first address PETA's standing to press its claim. *See CTS Corp. v. EPA*, 759 F.3d 52, 57 (D.C. Cir. 2014) ("as a matter of constitutional duty," court "must assure itself of its jurisdiction to act in every case").

## A. STANDING

As an organization, PETA "can assert standing on its own behalf, on behalf of its members or both." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Here, PETA asserts "organizational standing" only, "which requires it, like an individual plaintiff, to show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.' " *Id.* (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (in organizational-standing case, courts "conduct the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?" (quotation marks omitted)). The key issue is whether PETA has suffered a "concrete and demonstrable injury to [its] activities," mindful that, under our precedent, "a mere setback to [PETA's] abstract social interests is not sufficient." *Equal Rights Ctr.*, 633 F.3d at 1138 (quotation marks omitted); *see also Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987) ("The organization must allege that discrete programmatic concerns are being directly and adversely affected by the defendant's actions.").[3]

---

[3] On appeal, the USDA does not argue that PETA failed to demonstrate the causation and redressability prongs of standing. Because we have an independent obligation to satisfy ourselves that PETA has Article III standing, we must consider causation and redressability *sua sponte* and, having done so, agree with the district court that "the injuries complained of—USDA's refusal to take enforcement action in response to PETA's complaints and USDA's failure to compile the information PETA wants to use in its educational materials—are caused by the agency" and "the

The United States Supreme Court has made plain that a "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests" and thus suffices for standing. *Havens Realty Corp.*, 455 U.S. at 379. We, in turn, have elaborated as to when an organization's purported injury is *not* sufficiently concrete and demonstrable to invoke our jurisdiction. For example, "an organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact for purposes of standing." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011); *see also Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit."). "Nor is standing found when the only 'injury' arises from the effect of the regulations on the organizations' lobbying activities," *Ams. for Safe Access v. DEA*, 706 F.3d 438, 457 (D.C. Cir.) (quotation marks omitted), *cert. denied*, 134 S. Ct. 267 (2013), *and cert. denied sub nom. Olsen v. Drug Enforcement Admin.*, 134 S. Ct. 673 (2013), or when the " 'service' impaired is pure issue-advocacy," *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005).[4] To

---

remedies sought—an order compelling USDA to enforce the AWA with respect to birds . . .—would redress those injuries." *PETA I*, 7 F. Supp. 3d at 9.

[4] *But see Am. Soc. for Prevention of Cruelty to Animals*, 659 F.3d at 27 ("[M]any of our cases finding *Havens* standing involved activities that could just as easily be characterized as advocacy—and, indeed, sometimes are.").

determine whether an organization's injury is "concrete and demonstrable" or merely a "setback" to its "abstract social interests," *Havens Realty Corp.*, 455 U.S. at 379, we ask, first, whether the agency's action or omission to act "injured the [organization's] interest" and, second, whether the organization "used its resources to counteract that harm." *Equal Rights Ctr.*, 633 F.3d at 1140.

PETA's mission is to prevent "cruelty and inhumane treatment of animals." Compl. ¶ 5. It accomplishes this goal through "public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, and protest campaigns." *Id.* One of the "primary" ways in which PETA accomplishes its mission is "educating the public" by providing "information about the conditions of animals held by particular exhibitors." Jeffrey S. Kerr Decl. ¶ 16 (Kerr Decl.). As the district court explained, the USDA's refusal to apply the AWA to birds "perceptibly impaired" PETA's mission in two respects: it "precluded PETA from preventing cruelty to and inhumane treatment of these animals through its normal process of submitting USDA complaints" and it "deprived PETA of key information that it relies on to educate the public." *PETA I*, 7 F. Supp. 3d at 8 (alterations omitted).

We agree that PETA has, at the dismissal stage,[5] adequately shown that the USDA's inaction injured its interests and, consequently, PETA has expended resources to counteract those injuries. Indeed, PETA's alleged injuries are

---

[5] *See Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) ("At each stage of trial, the party invoking the court's jurisdiction must establish the predicates for standing with the manner and degree of evidence required at that stage of trial." (quotation marks omitted)).

materially indistinguishable from those alleged by the organizations in *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986). In that case, "four organizations that endeavor[ed], through informational, counseling, referral, and other services, to improve the lives of elderly citizens" sued the Secretary of the United States Department of Health and Human Services (HHS) because it had, *inter alia*, promulgated HHS-specific regulations that were allegedly inconsistent with "government-wide regulations" that "afford[ed] interested individuals and organizations a generous flow of information regarding services available to the elderly." *Id.* at 935–37. According to the organizations, "the HHS-specific regulations . . . significantly restrict[ed] that flow." *Id.* at 937. We reversed the district court's dismissal for lack of standing, concluding that the plaintiffs had pleaded "the same type of injury as the plaintiffs in *Havens Realty*: the challenged regulations den[ied] the [plaintiffs] access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities." *Id*. at 937–38. We held that, "[u]nlike the mere interest in a problem or [an] ideological injury," the plaintiffs had "alleged inhibition of their daily operations, an injury both concrete and specific to the work in which they are engaged." *Id.* at 938 (quotation marks and citations omitted).

So too here. Because PETA's alleged injuries—denial of access to bird-related AWA information including, in particular, investigatory information, and a means by which to seek redress for bird abuse—are "concrete and specific to the work in which they are engaged," *id.*, we find that PETA has alleged a cognizable injury sufficient to support standing. In other words, the USDA's allegedly unlawful failure to apply the AWA's general animal welfare regulations to birds has "perceptibly impaired [PETA's] ability" to both bring AWA

violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public. *See Am. Soc. for Prevention of Cruelty to Animals*, 659 F.3d at 25. Because PETA has expended resources to counter these injuries, it has established Article III organizational standing.

The USDA makes two responses, neither of which we find persuasive. First, it argues that it is not "at loggerheads" with PETA's mission of preventing cruelty to animals. Appellee's Br. 17–18. It so contends because the USDA does not in fact mistreat animals nor do its actions directly result in the mistreatment of animals. The USDA, however, misconstrues PETA's alleged harms; they do not result from the mistreatment of birds by third parties but rather from "a lack of redress for its complaints and a lack of information for its membership," both of which, PETA asserts, the USDA would provide if it complied with its legal obligations. *See PETA I*, 7 F. Supp. 3d at 9. Moreover, although we have emphasized the need for "a direct conflict between the defendant's conduct and the organization's mission," *Abigail Alliance*, 469 F.3d at 133, the USDA's allegedly unlawful conduct *does* hamper and directly conflicts with PETA's stated mission of preventing "cruelty and inhumane treatment of animals" through, *inter alia*, "public education" and "cruelty investigations." Compl. ¶ 5. Finally, it bears noting that our "at loggerheads" requirement exists because, "[i]f the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission," then it is " 'entirely speculative' whether the challenged practice will actually impair the organization's activities." *Am. Soc. for Prevention of Cruelty to Animals*, 659 F.3d at 25, 27 (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). Here, however, it is conceded that, if the USDA applies the AWA's general welfare standards to

birds, it will employ the same inspection reports and redress mechanisms for birds that it currently uses for other species. Accordingly, the USDA's challenged non-action plainly impairs PETA's activities in a non-speculative manner by "requir[ing]" PETA "to divert and redirect its limited resources to counteract and offset Defendant's unlawful conduct and omissions." Compl. ¶ 6. For example, PETA has alleged that:

- "[It] has submitted numerous formal AWA complaints to the USDA regarding birds." Kerr Decl. ¶ 7.

- When it submits complaints to the USDA regarding AWA-covered animal mistreatment, the "USDA generally dispatches an inspector to the facility at issue to determine if any AWA violations are occurring, and the resulting USDA inspection reports are made available in an online database." *Id.* ¶ 6.

- The USDA, however, "has consistently refused [to] take action on these complaints, asserting that it lacks jurisdiction and that it does not regulate birds." *Id.* ¶ 7.

- Consequently, PETA "has expended financial resources to investigate and respond to complaints about birds subjected to inhumane treatment, and/or to obtain appropriate and necessary relief for these animals," Compl. ¶ 6, by alternative means, including "researching the labyrinth of local and state cruelty-to-animals and wildlife statutes, regulations, and policies, as well as federal animal-related laws other than the AWA," Kerr Decl. ¶ 9.

- "PETA is also forced to expend time and resources preparing and submitting complaints to the pertinent local, state, and/or federal agencies . . . , which would be unnecessary if the USDA was properly regulating birds used for exhibition under the AWA." *Id.* ¶ 10; *see also id.* ¶ 11 (describing twelve "complaints PETA has been required to research and prepare as a result of the USDA's failure to regulate birds under the AWA").

- PETA "would not have needed to expend (or expend to the same extent) these resources absent [the USDA's] failures to comply with its mandates under the AWA." Compl. ¶ 6; *see also* Kerr Decl. ¶ 13 ("But for the USDA's failure to regulate birds under the AWA[,] PETA would not need to undertake these extensive efforts and expend the resources to do so.").

- "If it prevails in this action, PETA will no longer have to expend as many resources pursuing other avenues . . . ." Kerr Decl. ¶ 14.

Additionally:

- "One of the primary ways in which PETA works to prevent cruelty to and inhumane treatment of animals used for entertainment is by educating the public, especially through informational services." *Id.* ¶ 16; *see also id.* (describing variety of means by which PETA disseminates information).

- "The USDA's AWA inspection reports are the primary source of information relied upon by PETA in preparing these educational materials." *Id.* ¶ 17.

- "[T]he USDA's failure to regulate birds under the AWA . . . deprives PETA of information on which it routinely relies in its efforts to educate the public . . . ." *Id.* ¶ 15.

- "This embargo on information regarding the conditions of birds used for exhibition directly conflicts with PETA's mission to prevent cruelty to and inhumane treatment of animals and frustrates its public education efforts." *Id.* ¶ 18.

- "As a result of the USDA's failure to regulate birds under the AWA, PETA is required to expend resources to obtain information about the conditions of birds . . . , including through investigations, research, and state and local public records requests." *Id.* ¶ 19.

- "But for the USDA's failure to regulate birds under the AWA, PETA would not need to undertake . . . extensive efforts . . . ." *Id.* ¶ 20.

And finally, "PETA estimates that, as a direct result of the USDA's failure to regulate birds . . . , it has been forced to expend more than $10,000 on staff attorney time not related to this litigation and related expenses" and it expects to "continue expending more than $3,000 per year on the same unless and until the court grants the relief requested in this case." *Id.*

The USDA's second argument—that PETA's alleged injuries are self-inflicted and thus non-cognizable—fares no better. Granted, we have held that a "particular harm is self-inflicted" if "it results not from any actions taken by [the agency], but rather from the [organization's] own budgetary

choices." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994). That an organization "voluntarily, or willfully . . . diverts its resources, however, does not automatically mean that it cannot suffer an injury sufficient to confer standing." *Equal Rights Ctr.*, 633 F.3d at 1140 (alteration and citation omitted). We then ask whether the organization "undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged" unlawful acts "rather than in anticipation of litigation." *Id.* As already noted, PETA redirected its resources in response to USDA's allegedly unlawful failure to provide the means by which PETA would otherwise advance its mission—filing complaints with the USDA and using the USDA's information for its advocacy purposes. Contrary to the USDA's assertion, PETA did not "bootstrap its way into court by alleging that agency inaction renders its advocacy efforts more expensive." Appellee's Br. 21.

In sum, precedent makes plain that, if an organization expends resources "in response to, and to counteract, the effects of the defendants' alleged [unlawful conduct] rather than in anticipation of litigation," *Equal Rights Ctr.*, 633 F.3d at 1140, it has suffered a "concrete and demonstrable injury" that suffices for purposes of standing, *Havens Realty Corp.*, 455 U.S. at 379. PETA has expended—and must continue to expend—resources due to the USDA's allegedly unlawful failure to apply the AWA's protections to birds and its alleged injuries fit comfortably within our organizational-standing jurisprudence.

## B. Failure to State a Claim

Having won the standing battle, PETA nonetheless loses the war. As noted, the sole non-jurisdictional question is

whether the USDA has a policy of non-enforcement that constitutes agency action unlawfully withheld, in violation of section 706(1) of the APA—regardless whether the non-enforcement has gone on for a reasonable or unreasonable length of time. The district court found, *see PETA I*, 7 F. Supp. 3d at 13, and, on PETA's motion for reconsideration, iterated, *see PETA v. USDA (PETA II)*, 60 F. Supp. 3d 14, 18 (D.D.C. 2014), that the USDA's enforcement decisions are "unreviewable because they are 'committed to agency discretion by law.' " *PETA I*, 7 F.Supp. 3d at 13 (quoting 5 U.S.C. § 701(a)(2)); *see also PETA II*, 60 F. Supp. 3d at 16–19 (same). PETA maintains that the district court erred in two ways. PETA first argues that the Congress took away the USDA's enforcement discretion because "[t]he clear implication of the AWA is that all entities wishing to sell or exhibit animals must first obtain a license from the USDA—and the agency may not, consistent with the regime, announce to the world that no such license will be required to any facility that sells or exhibits an entire class of animals." Appellant's Br. 31 (quotation marks and emphasis omitted). PETA further contends that the USDA's failure to apply the general AWA standards is a judicially reviewable "wholesale abdication of enforcement as to an entire biological class over the course of a dozen years." *Id.* at 29 (emphasis omitted).

"[A] party must first clear the hurdle of [section] 701(a)," which prohibits judicial review of agency action "to the extent that . . . agency action is committed to agency discretion by law." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (quotation marks omitted). Section 701(a)(2) of the APA is not, however, a jurisdictional bar. *See Oryszak v. Sullivan*, 576 F.3d 522, 524–25 & n.2 (D.C. Cir. 2009). For that reason, we need not decide whether the USDA has in fact adopted a general policy of non-enforcement that could be

subject to review under the APA.[6]  Instead, we affirm the district court on the alternative ground that PETA failed to plausibly allege that the USDA's decade-long inaction constitutes agency action unlawfully withheld.  *See Munsell v. USDA*, 509 F.3d 572, 592–93 (D.C. Cir. 2007) (concluding requirement was non-jurisdictional but affirming dismissal on alternative ground supported by record).

In *Norton v. Southern Utah Wilderness Alliance (SUWA)*, the Supreme Court set out the "limits the APA places upon judicial review of agency inaction."  542 U.S. 55, 61 (2004). Relevant here, the Court held that "a claim under [section] 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*," *id.* at 64 (emphases in original), and cannot be used "to enter general orders compelling compliance with broad statutory mandates," *id.* at 66.  It explained that the "discrete agency action" limitation "precludes . . . broad programmatic attack[s]" and the "*required* agency action" limitation "rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* (emphasis in original).  If, for example, "an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.* at 65.

The USDA argues that PETA cannot satisfy the *SUWA* test.  We agree.  PETA insists that the USDA must "promulgate[] standards that apply to *all* animals covered by the AWA, 7 U.S.C. § 2143(a)(1), and apply those standards

---

⁶ Similarly, we need not decide whether the district court imposed a "heightened pleading standard" on PETA's allegation of agency policy.  Appellant's Br. 45.

through the licensure system, *id.* § 2133." Reply Br. 33 (emphasis in original). But even if the USDA has adopted an *interim* policy of non-enforcement pending the adoption of bird-specific regulations, as PETA alleges, nothing in the AWA requires the USDA to apply the general animal welfare standards to birds (which standards it views, at best, as ineffective and, at worst, as hazardous to avians, *see* Animal Welfare; Regulations and Standards for Birds, Rats, and Mice, 69 Fed. Reg. at 31,538–39[7]) before it has promulgated more appropriate bird-specific regulations. *Cf. Cutler v. Hayes*, 818 F.2d 879, 892–93 (D.C. Cir. 1987) (upholding FDA policy of "postponing enforcement of the [Food, Drug, and Cosmetic] Act's efficacy requirement . . . until the completion of [the agency's] OTC drug review program" because "Congress has not given FDA an inflexible mandate to bring enforcement actions against all violators of the Act" (footnote omitted)). Therefore, even assuming that the USDA "is compelled by law to act," *SUWA*, 542 U.S. at 65, we have no power to say that it must do so *before* finalizing its bird-specific regulations, at least in light of PETA's abandonment of its argument that the USDA "unreasonably delayed" enforcement, *see* Reply Br. 32–33. Moreover, the AWA's mandatory licensure requirement is directed to "dealer[s]" and "exhibitor[s]" of animals, not to the USDA. *See* 7 U.S.C. § 2134. While section 2133 of the AWA provides that the USDA "shall issue licenses to dealer[s] and exhibitor[s] upon application therefor in such form and manner as [it] may prescribe," *id.* § 2133, this congressional directive does not mean that the USDA must *demand* licensure in all instances. Thus, we cannot say that the USDA has failed to take action it

---

[7] *See also, e.g.*, Johanna Briscoe Decl. ¶ 17 ("APHIS also recognizes that breeding requirements for certain species preclude daily cleaning and human interference (i.e. nesting birds may purposely crush their eggs if a stranger enters the vicinity.")).

was "*required to take*." *SUWA*, 542 U.S. at 64 (emphasis in original).

For the foregoing reasons, we affirm the district court's judgment of dismissal.

*So ordered.*

MILLETT, *Circuit Judge*, *dubitante*: If the slate were clean, I would feel obligated to dissent from the majority's standing decision. But I am afraid that the slate has been written upon, and this court's "organizational standing" precedent will not let me extricate this case from its grasp. Or at least not without making fine distinctions that would just skate around the heart of the problem. The majority opinion holds that standing exists because the government's *inaction* injured PETA's "*interest*" in having the Animal Welfare Act *enforced* against certain *third parties*, and because PETA *chose* to devote its own resources to make up for the government's enforcement "*omission*." Maj. Op. 11 (emphases added).

That ruling is in grave tension with Article III precedent and principles, such as the principle that an individual's interest in having the law properly enforced against others is not, without more, a cognizable Article III injury. *See*, *e.g.*, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973); *Sargeant v. Dixon*, 130 F.3d 1067, 1068 (D.C. Cir. 1997). It is also hard to reconcile with the general rule that a plaintiff's voluntary expenditure of resources to counteract governmental action that only indirectly affects the plaintiff does not support standing. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148–1151 (2013).

At bottom, PETA thinks the government should do more to enforce the law against bird exhibitors, and so has voluntarily taken steps to protect birds itself. That may be laudable, but it is not an Article III redressable injury. If circuit precedent has brought us to the point where organizations get standing on terms that the Supreme Court has said individuals cannot, then it may be time, in an appropriate case, to revisit the proper metes and bounds of "organizational standing."

I should note, at the outset, that my views do not in any way question the sincerity of PETA's concern for neglected and abused birds or its desire to better their conditions. Nor can I criticize the majority for its decision. The majority opinion hews faithfully to precedential lines, as we must at this procedural juncture. *See General Comm. of Adjustment, GO-386 v. Burlington Northern & Santa Fe Ry. Co.*, 295 F.3d 1337, 1340 (D.C. Cir. 2002) (circuit precedent "binds us, unless and until overturned by the court en banc or by [h]igher [a]uthority") (internal quotation marks omitted).

"Organizational standing" started from the common-sense determination that organizations, like individuals, can suffer direct and concrete injuries for Article III purposes. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 511 (1974). At least in the form seen here, the doctrine traces its origins to the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In that case, Housing Opportunities Made Equal ("HOME"), a group dedicated to achieving equal housing opportunity, and individual plaintiffs brought a Fair Housing Act challenge to the racially discriminatory housing practices of an apartment complex owner. *See id.* at 367–369. The Fair Housing Act "conferred on all 'persons' a legal right to truthful information about housing," *id.* at 373, by making it unlawful to "represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available," 42 U.S.C. § 3604(d).

After first holding that an individual plaintiff had standing, *Havens*, 455 U.S. at 374, the Supreme Court went on to rule that HOME had standing as well, *id.* at 379. That is unsurprising because the Fair Housing Act specifically defines the "persons" entitled to truthful housing information

to include "associations" as well as "one or more individuals." 42 U.S.C. § 3602(d). HOME had also identified how the discriminatory misinformation it was given about housing opportunities directly frustrated and unraveled its efforts to match individuals with available housing. In particular, HOME alleged that the challenged racial steering practices "frustrated * * * its efforts to assist equal access to housing through counseling and other referral services," and forced it "to devote significant resources to identify and counteract" the unlawful conduct targeted at it. *Havens*, 455 U.S. at 379. The Supreme Court concluded that, because the alleged practices had "perceptibly impaired [the group's] ability to provide counseling and referral services," the organization had plainly suffered an injury in fact. *Id.* That "concrete and demonstrable injury to the organization's activities" and "consequent drain on the organization's resources," the Court stressed, represented "far more than simply a setback to the organization's abstract social interests," which could not have conferred standing. *Id.*

*Havens*' recognition of HOME's organizational standing makes sense. Federal law vested HOME with a specific legal right to truthful, non-discriminatory housing information, and Havens Realty's racially disparate misinformation targeted HOME along with the individuals it was aiding. The apartment owner's violations unraveled again and again the work and resources that HOME had put into providing housing and equal housing opportunities for its clients. Put simply, what HOME used its own resources, information, and client base to build up, Havens Realty's racist lies tore down. That is the type of direct, concrete, and immediate injury that Article III recognizes. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014) (*Havens* involved a statutory entitlement to truthful information, and "[t]he misinformation provided by the *Havens* defendants, i.e.[,] a

lie told to black renters, including a member of the organization, that no rental units were available, directly interfered with the organization's ability to provide truthful counseling and referral services."); *see also American Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 550 (6th Cir. 2003) (Kennedy, J., concurring in part and dissenting in part) (HOME's injury was "specific, cognizable, and particular" because the group "encountered significant difficulty helping individual plaintiffs counteract discrimination directed at them in a localized area"); 13A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3531.2, at 100 (3d ed. 2008) (HOME "was engaged in specific efforts to aid particular people who in fact had been injured by housing discrimination").

The problem is not *Havens* or the concept of organizational standing. The problem is what our precedent has done with *Havens*. As this case illustrates, our organizational standing precedents now hold that the required Article III injury need not be what the defendant has done to the plaintiff; it can also be what the defendant has not done to a third party. And the manifestation of that injury is not that the defendant has torn down, undone, devalued, or otherwise countermanded the organization's own activities or deprived it of a statutorily conferred right. It is instead a failure to facilitate or subsidize through governmental enforcement the organization's vindication of its own parallel interests. *See* Maj. Op. 11–13, 17; *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937 (D.C. Cir. 1986) (senior citizens group's "programmatic concerns" hampered by agency regulations that (i) limited the information the agency had previously provided in other contexts, and (ii) made raising certain challenges within the agency more difficult); *id.* at 937–938 (by pleading denial of "access to information and avenues of redress they wish to

use in their routine information-dispensing, counseling and referral activities," organizations "have alleged inhibition of their daily operations" sufficient for standing purposes).[1]

That takes standing principles to—and I think over—the brink. To be clear, PETA does not claim here that the Department of Agriculture directly contributes to the unlawful mistreatment of birds that PETA aims to halt, or has denied PETA information to which any law or regulation entitles it. Nor does PETA claim that the government has dismantled, affirmatively undermined, or engaged in a campaign of misinformation that has damaged PETA's independent efforts to protect birds. Instead, as the majority opinion explains, PETA's asserted Article III injuries are:

- PETA has filed complaints on which the Department has not acted; PETA then chose to expend resources pursuing "alternative means" of protecting birds; if it prevails, PETA will not have to expend "as many resources" pursuing other types of bird protection. Maj. Op. 14–15 (quoting Kerr Decl. ¶¶ 9, 14).

---

[1] *See also ASPCA v. Feld Entertainment, Inc.*, 659 F.3d 13, 27 (D.C. Cir. 2011) (reserving the question whether an organization has standing based on "expend[ing] additional resources on public education to rebut the misimpression, allegedly caused by [the defendant's] practices"); *compare also Center for Law & Educ. v. Department of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) (rejecting organizational standing where "the only 'service' impaired is pure issue-advocacy"), *with Feld Entertainment*, 659 F.3d at 26–28 (impairment of a group's ability to provide advocacy services *may* qualify as injury where a defendant's conduct is "at loggerheads" with the group's mission) (quoting *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996)).

- PETA is not receiving inspection reports for birds that the Department has voluntarily produced after enforcement efforts involving other animals, and the absence of such reports means that PETA expends resources compiling its own information to educate the public; if successful, PETA would rely on the government's reporting and undertake less "extensive" efforts of its own. Maj. Op. 15–16 (quoting Kerr Decl. ¶ 20).

Neither of those should count as judicially redressable under Article III.

### *Inaction on PETA Complaints*

The Department's failure to act on PETA's complaints should be a complete non-starter for Article III purposes. The cases are legion holding that PETA has no legally protected or judicially cognizable interest in the enforcement of the Animal Welfare Act against third parties for its own sake. *See*, *e.g.*, *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (It is "settled doctrine that the exercise of prosecutorial discretion cannot be challenged by one who is himself neither prosecuted nor threatened with prosecution."); *Linda R.S.*, 410 U.S. at 619 ("[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.").[2]

---

[2] *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 574–578 (1992) (no standing based on generalized objection to insufficient enforcement of the law); *High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 606 (D.C. Cir. 2002) (no "standing to object to the agency's refusal to sanction" a third party); *Sargeant*, 130 F.3d at 1069 ("[T]he interests Mohwish proffers—in the prosecution of

Nor does PETA's sincere and deep "interest" (Maj. Op. 11) in promoting the humane treatment of birds get it across the Article III threshold. *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (Article III does not permit "any group with a bona fide 'special interest'" in the law's enforcement to bring suit.); *Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002) ("Petitioners seem to believe that their 'commitment' to their cause and the alleged importance of their cause is enough to confer Article III standing. It is not.").[3]

Since those general interests in the law and its enforcement will not suffice, PETA needed to identify a specific and concrete "legally protected interest" of its own that has been injured by the government's non-enforcement practices. *Lujan*, 504 U.S. at 560. But neither PETA nor the majority opinion has done so. Unlike HOME's specific informational right under the Fair Housing Act, absolutely nothing in the Animal Welfare Act invests PETA with any right to have its complaints acted upon or its resource-allocations eased.

That the Department of Agriculture accepts such private complaints without any apparent statutory requirement to do

---

government officials and in seeing that the laws are enforced—are not legally cognizable within the framework of Article III.").

[3] *See also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982) ("[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy."); *Feld Entertainment*, 659 F.3d at 24 ("[A]n organization's abstract interest in a problem is insufficient to establish standing, 'no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem.'") (quoting *Sierra Club*, 405 U.S. at 739).

so is not enough. The "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009). Thus, "absent the ability to demonstrate a 'discrete injury' flowing from the alleged violation," PETA "cannot establish standing merely by asserting that the [agency] failed to process its complaint in accordance with law." *Common Cause v. FEC*, 108 F.3d 413, 419 (D.C. Cir. 1997).

If PETA is not injured in any legally relevant sense by the government's failure to act on its complaints, how can its decision to incur additional expenses in the wake of that failure be anything other than a self-chosen consequence of any governmental non-enforcement decision? I cannot imagine that *Simon* would have come out differently if the Eastern Kentucky Welfare Rights Organization had just added an allegation that it had chosen to expend its own resources to shine a light on hospitals' mistreatment of the indigent that the Internal Revenue Service's tax decisions allegedly tolerated. Nor, I presume, could Linda R.S. have gotten into court if she had just added to her complaint an allegation that, absent prosecution, she would have to expend her own resources hiring a private investigator or asking the employer of her child's father to garnish his wages. Article III's requirement of a concrete injury to a legally protected interest demands more than just creative pleading.

Underscoring the point, the Supreme Court recently held that, where concerns about governmental action that was not targeted at the plaintiffs did not constitute an Article III injury, the costs voluntarily incurred in response to those concerns could not fill in the gap either. *See Clapper*, 133 S. Ct. at 1152. Surely that case would not have been decided

differently if Amnesty International had simply alleged that it had to divert its resources to educate the public about how to protect themselves against government surveillance.

Finally, PETA's contention that its resources will be better allocated if its complaints are acted upon runs into a fierce separation-of-powers headwind. The claim of injury here is simply that, given the Executive Branch's chosen level of enforcement under the Animal Welfare Act, PETA must expend *more* resources than it would otherwise have to in pursuit of its parallel goals. *See* Maj. Op. 15 (if the suit is successful, PETA "will no longer have to expend *as many* resources pursuing other avenues") (emphasis added) (quoting Kerr Decl. ¶ 14). While this case alleges non-enforcement, if standing exists here, then there is no meaningful reason why suit could not be brought every time an organization believes that the government is not enforcing the law as much, as often, or as vigorously as it would like. And maybe a different group could sue if it believes the law is being enforced too much and so chooses to use its resources to advise the public about the harms of over-enforcement.

Article III's standing requirement is meant to "help[] preserve the Constitution's separation of powers and demarcates 'the proper—and properly limited—role of the courts in a democratic society.'" *Coalition for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1278–1279 (D.C. Cir. 2012) (quoting *Warth*, 422 U.S. at 498). Yet hinging judicial superintendence of Executive enforcement decisions on nothing more than a group's unadorned interest in the law's purposes, combined with just a dash of volitional counter-expenditures, would make the courts "virtually continuing monitors of the wisdom and soundness of Executive action." *Lujan*, 504 U.S. at 577 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)).

***Failure to Produce Enforcement Reports***

PETA's claim of informational injury should not open the Article III door either, for one simple reason: Even as alleged by PETA, there is no suggestion that anything in the Animal Welfare Act or any regulation gives PETA any legal *right* to such information or reports. PETA thus may claim that its resource-allocation decisions are injured by the absence of such reports from the agency; but that injury is not even colorably tied to a "legally protected interest" in obtaining that information, as *Lujan* requires, 504 U.S. at 560.

To be sure, the majority opinion's contrary determination just walks the path that circuit precedent has trodden. In *Action Alliance*, this court held that a group promoting the interests of the elderly had organizational standing because the Secretary of Health and Human Services failed to apply to her Department the same age discrimination regulations applied to other federal agencies. This court reasoned that, if the Department had followed the same information-disclosure regulations as other agencies, then it would have produced more information, which the plaintiff group could then use to refer its members to services or to provide age-discrimination counseling. *Action Alliance*, 789 F.2d at 935, 937.

*Action Alliance* was perhaps justifiable on its facts. As in *Havens* itself, the information sought was arguably required to be disclosed at least by regulation, and was being put to a specific use by the plaintiffs seeking to protect the legal rights of the elderly individuals they served. *See* Cass R. Sunstein, *Informational Regulation and Informational Standing:* Akins *and Beyond*, 147 U. PA. L. REV. 613, 664 (1999).

But in subsequent cases, we have relied on *Action Alliance* for the proposition that organizational standing may exist more broadly whenever "information is essential to the

11

injured organization's activities, and where the lack of the information will render those activities infeasible." *Competitive Enterprise Institute v. NHTSA*, 901 F.2d 107, 122 (D.C. Cir. 1990); *see also Animal Legal Defense Fund, Inc. v. Espy* ("*Espy II*"), 29 F.3d 720, 724 (D.C. Cir. 1994) (extending a similar rule to the Animal Welfare Act); *Animal Legal Defense Fund, Inc. v. Espy* ("*Espy I*"), 23 F.3d 496, 501–502 (D.C. Cir. 1994) (same).[4]

This case, however, goes even further. At least in earlier cases, there was something somewhere in the law that at least required the agency to generate the reports in the first instance (even assuming that would be enough to create a private right to such information). In our Animal Welfare Act cases, for example, the Secretary was required to include the information at issue in an annual report submitted to Congress. *See Espy I*, 23 F.3d at 501.[5] In this case, PETA points to nothing that requires the Department to generate the enforcement reports that it finds so helpful, let alone a legal

---

[4] We have also concluded, in the cases brought under the Animal Welfare Act, that the organization alleging informational injury failed to establish that the zone-of-interests test had been met. *See Espy II*, 29 F.3d at 724; *Espy I*, 23 F.3d at 502–504. But the government has not raised that challenge to PETA's suit here. That would not in any event affect the jurisdictional analysis, because the Supreme Court has since made clear that the zone-of-interests analysis is not a standing inquiry required by Article III. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 & n.4 (2014).

[5] That requirement has since been eliminated. *See* Federal Reports Elimination and Sunset Act of 1995, Pub. L. No. 104-66, § 3003, 109 Stat. 707; *see also* 7 U.S.C. § 2155 codifications note.

basis for asserting an enforceable private right to such information. Nor does PETA claim to be using the information to educate other individuals who are protected by the statute about their legal rights.

That presses the concept of informational standing far beyond anything the Supreme Court itself has recognized. In *FEC v. Akins*, 524 U.S. 11 (1998), the Supreme Court recognized a claim of informational injury when: (i) on the plaintiff's view of the law, the government or a third party was required by statute to make public the information at issue, *id.* at 21, and (ii) the plaintiff's interest in the information was "directly related" to the exercise of the person's own individual right to vote, "the most basic of political rights," *id.* at 24–25.

We have thus recognized that "[o]nly if the statute grants a plaintiff a concrete interest in the information sought will he be able to assert an injury in fact." *Nader v. FEC*, 725 F.3d 226, 229 (D.C. Cir. 2013). Absent such a statutory basis, we have held that the claim of informational standing fails.[6] At least we had until today.

Furthermore, unlike *Akins* where the claim was premised on a desire to have information about a group's role in an election in which the plaintiff intended to vote, PETA has identified no concrete piece of information in the agency's possession that it is seeking, let alone that it has any legal right to. The agency would not even acquire the desired information unless it were first to enforce the law as PETA

---

[6] *See Feld Entertainment*, 659 F.3d at 23–24; *see also Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (standing available at least where statute requires information to be publicly disclosed and plaintiff plausibly claims that the information would help it).

desires. But if PETA lacks Article III standing to require the agency to enforce the law against third parties, it surely cannot get standing through the back-door route of claiming injury by the absence of post-enforcement reports.

To be sure, the Supreme Court's decision in *Akins* did not specifically displace our precedent finding organizational standing when the failure to provide information "impinge[d] on the plaintiff's daily operations or [made] normal operations infeasible." *Akins v. FEC*, 101 F.3d 731, 735 (D.C. Cir. 1996), *vacated by* 524 U.S. at 29; *Competitive Enterprise Institute*, 901 F.2d at 122 (similar). But as this case makes all too clear, the broad reach of our case law is getting increasingly hard to square with Supreme Court precedent handed down since *Action Alliance*.

*First*, the notion that an organization's "desire to supply * * * information to its members" and the "'injury' it suffers when the information is not forthcoming" are "*without more*" sufficient to establish standing runs headlong into "the obstacle of *Sierra Club v. Morton*." *Foundation of Economic Trends v. Lyng*, 943 F.2d 79, 84–85 (D.C. Cir. 1991). *Sierra Club* held that a group's "mere 'interest in a problem'" could not suffice for standing purposes, 405 U.S. at 739, and "[i]t is not apparent why an organization's desire for information about the same * * * problem should rest on a different footing," *Foundation of Economic Trends*, 943 F.2d at 85; *see Akins*, 101 F.3d at 746 (Sentelle, J., dissenting) (arguing that *Action Alliance* was inconsistent with *Sierra Club*).

To the extent, then, that PETA has organized one of its many operations around disseminating information to which it does not have a legal entitlement, I can see no sound basis for elevating the government's failure to facilitate those operations to the level of an Article III injury. Doing so just

confuses an *inconvenience* with an "injury in fact" to a "legally protected interest," *Lujan*, 504 U.S. at 560.

*Second*, PETA does not seek information that is in any way connected to the exercise of a right conferred by the Animal Welfare Act, akin to the linkage between information and voting in *Akin*. PETA's purpose in seeking this information appears to be simply to have the information for its own educational and promotional materials, so that it can conserve or redirect its own resources. But "[t]o hold that a plaintiff can establish injury in fact merely by alleging that he has been deprived of the knowledge as to whether a violation of the law has occurred"—whatever the personal use it intends to make of that knowledge—"would be tantamount to recognizing a justiciable interest in the enforcement of the law." *Common Cause*, 108 F.3d at 418.

*Finally*, it is hard to see how the doctrine we have embraced can practically be cabined. "'[I]nformational injury,' in its broadest sense, exists day in and day out, whenever federal agencies are not creating information a member of the public would like to have." *Foundation of Economic Trends*, 943 F.2d at 85. If PETA's position is correct, any organization could, as part of its mission to advance enforcement of a given law, begin disseminating information an agency chooses to publish, and thereby gain a legally protected interest in preserving that flow of information through some form of "informational adverse possession." Could an organization disseminate reports based on a U.S. Attorney's Office's public press releases and consequently claim a justiciable interest in the enforcement of the federal criminal code because it would generate more press releases? Surely not. And why should the group status matter at all? *See Common Cause*, 108 F.3d at 417 ("[S]tanding requirements apply with no less force to suits

brought by organizational plaintiffs."). The same principles that prevent any individual caped crusader from using the courts to vindicate his or her views as to the proper enforcement of the laws should preclude the same gambit by a group of likeminded individuals. As for Batman or Wonder Woman, so too for the Justice League.

\* \* \*

At bottom, standing in this case is grounded on a claimed (i) protection from making voluntary resource choices when responding to the government's failure to enforce the law against third parties, and (ii) information generated as a byproduct of the government's enforcement activities without any alleged statutory obligation to make it at all, let alone to make it public. I find it mighty difficult to see any real daylight between that claim of standing and the grant of a justiciable interest in the enforcement of the law that we have long said Article III does not permit.