# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 22, 2020          Decided June 16, 2020

No. 19-5147

FRIENDS OF ANIMALS,
APPELLANT

v.

DAVID LONGLY BERNHARDT, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE INTERIOR, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02530)

---

*Stephen R. Hernick* argued the cause for appellant Friends of Animals. With him on the briefs were *Michael R. Harris* and *Jennifer E. Best*.

*Sommer H. Engels*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With her on the brief were *Eric A. Grant*, Deputy Assistant Attorney General, and *Andrew C. Mergen* and *Avi M. Kupfer*, Attorneys.

*Jeremy E. Clare* and *Michael T. Jean* were on the brief for intervenor-appellees Safari Club International and the National Rifle Association of America. *Christopher A. Conte* entered an appearance.

2

No. 19-5152

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
APPELLANTS

v.

DAVID LONGLY BERNHARDT, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE U.S. DEPARTMENT OF THE INTERIOR, ET
AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02504)

———

*Tanya M. Sanerib* argued the cause for appellants Center for Biological Diversity, et al. With her on the briefs were *Anna E. Frostic* and *Sarah Uhlemann*.

*Sommer H. Engels*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With her on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Eric A. Grant*, Deputy Assistant Attorney General, and *Andrew C. Mergen* and *Avi M. Kupfer*, Attorneys.

*Jeremy E. Clare* and *Michael T. Jean* were on the brief for intervenor-appellees Safari Club International and National Rifle Association of America.

Before: GRIFFITH and PILLARD, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: These cases raise some interesting administrative law questions. Appellants, conservation organizations and a safari guide, challenge a series of actions of the U.S. Fish and Wildlife Service governing imports of sport-hunted animal trophies from Africa. Appellants initially challenged certain "findings" the Service made that would allow such trophies to be imported. We subsequently reviewed a similar set of findings in another case and concluded that they were legislative rules illegally issued without notice and comment. The Service then withdrew all its findings that suffered from the same deficiency, including those challenged by appellants in the two cases before us, and announced that in the future it would proceed by informal adjudication. Nevertheless, appellants wish to contest the withdrawn findings, claiming that they are relied on in the Service's informal adjudications. Appellants assert, moreover, that it was illegal for the Service to abandon its prior findings without engaging in APA informal rulemaking, and that it also was illegal for the Service to announce its intent to make the necessary findings through informal adjudications in the future. We affirm the district court's thoughtful rejection of these claims in this consolidated opinion.

## I.

The disputes in these cases arise from the Service's regulation of imports of certain sport-hunted animal trophies from Africa. The Service is tasked with determining under what conditions it will grant hunters permits to import "sport-hunted trophies," which it has termed "a whole dead

animal or a readily recognizable part or derivative of an animal." 50 C.F.R. § 23.74(b). We have previously described at length the governing regulatory regime under the Convention on International Trade of Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087, and the Endangered Species Act, 16 U.S.C. §§ 1531–1544. *See Safari Club Int'l v. Zinke* (*Safari Club II*), 878 F.3d 316, 321–23 (D.C. Cir. 2017).

We deal here with the requirements governing permits to import trophies of species that are classified as "threatened." The Service, by legislative rule, has instituted a general ban on importing such trophies, subject to species-specific exceptions. Those exceptions, in turn, generally impose at least two requirements before a permit may be granted: First, the Service must determine that the killing of the trophy animal will enhance the survival of the species (the "enhancement" finding). *See, e.g.,* 50 C.F.R. § 17.40(e)(6)(i)(B) (African elephants); *id.* § 17.40(r) (lions) (referencing § 17.32). Second, the Service must determine that the proposed import will not be detrimental to the survival of the species (the "non-detriment" finding). *See id.* § 23.61(a); *see also id.* § 17.40(e)(6)(i)(D) (referencing § 23); *id.* § 17.40(r)(3) (same).

For many years, the Service periodically made blanket enhancement and non-detriment "findings" to govern all applications to import particular species taken in particular countries over a given time period. In 2014, for example, the Service issued a *negative* enhancement finding for African elephants taken as sport-hunted trophies in Zimbabwe. It concluded that in the absence of current data it was unable to determine that sport-hunting of elephants in Zimbabwe would enhance the survival of the species. The Service came to the same conclusion in 2015, extending the

suspension of imports through the 2015 hunting season and future hunting seasons. As it had done for years, the Service issued the 2014 and 2015 Zimbabwe elephant findings without proceeding under § 553 of the Administrative Procedure Act, which of course requires notice and comment.

That led Safari Club International and the National Rifle Association to seek judicial review of the 2014 and 2015 Zimbabwe elephant findings in our district court. They argued, *inter alia*, that the "findings" were rules subject to the notice-and-comment requirements of the APA. Before that case came to our court, the Service issued two new *positive* enhancement findings in late 2017. The Service determined that the sport-hunting of elephants in Zimbabwe would enhance the survival of the species during 2018, 2017, and much of 2016. It came to the same conclusion with respect to Zimbabwe's lions.

Appellants in the present cases, with interests opposite from Safari Club and the NRA, then sued. One group, made up of the Center for Biological Diversity, three other conservation organizations, and a local safari guide (collectively "the Center"), challenged the 2017 Zimbabwe elephant and lion findings as arbitrary and capricious, contrary to law, and—as Safari Club and the NRA had argued about the 2014 and 2015 findings—in violation of the APA's rulemaking procedures. The second group, made up of Friends of Animals and the Zimbabwe Conservation Task Force (collectively "Friends of Animals"), challenged just the 2017 Zimbabwe elephant finding on largely the same grounds.

Before the district court decided the cases brought by the conservation organizations, we agreed with Safari Club and the NRA that the 2014 and 2015 Zimbabwe elephant findings

were not really the products of adjudications, but were actually rules subject to the APA's notice and comment procedures. *Safari Club II*, 878 F.3d at 331–34. We explained that the so-called "findings" did not adjudicate any dispute between specific parties, resulted in no immediate legal consequences for any specific parties, and were not made "in the course of denying an application for an import permit." *Id.* at 334; *see id.* at 333–34. We instructed the district court "to remand the case to the Service so that it may initiate rule making to address enhancement findings for the time periods at issue in this case." *Id.* at 336. In other words, we anticipated (but did not require) that the Service would issue its enhancement determinations through rulemaking.

However, in March 2018, the Service issued a memorandum withdrawing the disputed 2014 and 2015 findings "[i]n response to the D.C. Circuit Court's opinion in [*Safari Club II*]."[1] The "March Memo" also withdrew a number of other enhancement and non-detriment findings, including the 2017 Zimbabwe elephant and lion findings challenged by the Center and Friends of Animals, as equally illegal. The Memo acknowledged, however, that although the withdrawn findings were no longer effective, the Service intended to use the information relied upon in the defective findings as appropriate when evaluating individual permit applications. It also set forth the Service's plan to make future enhancement and non-detriment findings when considering permit applications on a case-by-case basis—in other words, by informal adjudication. The Center and Friends of Animals then amended their respective complaints

---

[1] Memorandum, Withdrawal of Certain Findings for ESA-listed Species Taken as Sport-hunted Trophies (Mar. 1, 2018), *reproduced at* No. 19-5152 J.A. at 49.

to add challenges to the March Memo on grounds we discuss below. Safari Club and the NRA intervened as defendants in each case.

The district court dismissed the conservation organizations' challenges for lack of subject matter jurisdiction and failure to state a claim, for largely identical reasons. *See Ctr. for Biological Diversity v. Zinke*, 369 F. Supp. 3d 164, 183 (D.D.C. 2019); *Friends of Animals v. Zinke*, 373 F. Supp. 3d 70, 91–92 (D.D.C. 2019). Appellants' claims before us fall roughly into three categories: (1) challenges to the 2017 Zimbabwe findings; (2) challenges to the March Memo's withdrawal of prior findings; and (3) challenges to the March Memo's announcement that the Service now intends to make findings on a case-by-case basis when considering individual permit applications. We take the issues related to each category of claims in turn.

## II.

### A.

The district court first dismissed appellants' respective challenges to the 2017 Zimbabwe findings as moot, reasoning that the March Memo had already eliminated their legal effects. *See Ctr. for Biological Diversity*, 369 F. Supp. 3d at 173; *Friends of Animals*, 373 F. Supp. 3d at 83. The Center contends that the Service actually has continued to rely on the substance and conclusions of the 2017 findings in its "case-by-case" permitting decisions (informal adjudications), so a court order declaring those conclusions invalid would still provide the Center with meaningful relief. And even if its challenges to the 2017 findings are moot, the Center argues, the "voluntary cessation" doctrine should apply.

Friends of Animals agrees that the March Memo amounts to voluntary cessation and also presses the other exception to mootness, contending the flaws in the 2017 Zimbabwe elephant finding are capable of repetition yet would evade review. The government responds that while its case-by-case permitting decisions may rely on information cited in the withdrawn findings, the findings themselves unquestionably no longer have any legal effect, and it is inconceivable that the Service will attempt to reinstate across-the-board findings without notice and comment in light of our opinion in *Safari Club II*.

We think the government is correct. We of course lack power under Article III to decide an issue "when the question sought to be adjudicated has been mooted by subsequent developments." *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 813–14 (D.C. Cir. 1982) (internal quotation omitted). And we have recognized that the government's abandonment of a challenged regulation is just the sort of development that can moot an issue. *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 840 (D.C. Cir. 1985). In both cases before us, appellants challenged one or more of the 2017 findings as unlawful under the APA for various reasons and requested that the court declare as much and set them aside. But after our opinion declared "findings" with identical procedural characteristics to be unlawful rules, and the government, through its March Memo, withdrew the 2017 findings, they no longer cause appellants any injury. Since we can do nothing to affect appellants' rights relative to those now-withdrawn findings, appellants' challenges to them are

"classically moot." *Akiachak Native Cmty. v. U.S. Dep't of the Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016).[2]

That the Service subsequently has issued import permits containing language that often matches that of the 2017 findings does not alter our conclusion. The March Memo acknowledges that the Service intends to use "the *information* cited in [the withdrawn] findings and contained in its files *as appropriate*," and that is "in addition to the information it receives and has available when it receives each [permit] application." No. 19-5152 J.A. at 49–50 (emphasis added). That is standard agency practice. But that practice does not mean that the actual 2017 findings themselves are still in effect.

Nor are the alleged errors in the 2017 Zimbabwe findings capable of repetition in a way that evades review. As noted earlier, appellants challenged those findings both as in violation of the APA's rulemaking requirements and as deficient in reasoning. We decided the rulemaking question with respect to these sorts of findings in *Safari Club II*, but then had no occasion to address the reasonableness of the Service's substantive conclusions. *See* 878 F.3d at 331. There can be no "reasonable expectation" that the same procedural error will recur in the face of our decision forbidding the government from employing countrywide findings as it did in *Safari Club II* without notice and comment. *People for the Ethical Treatment of Animals v. Gittens*, 396 F.3d 416, 423 (D.C. Cir. 2005) (internal quotation omitted).

---

[2] Appellants obviously contend that the withdrawal of the 2017 findings was itself unlawful, but as we will explain, they have not shown that they have standing to bring those particular claims. *See infra* Part II.B.1.

As to the Service's substantive conclusions, appellants have not shown that "if a controversy of this sort occurred again it would evade judicial review." *Id.* at 424. Rather, prior litigation in this area suggests such disputes—even over permits—could be timely adjudicated. *See generally Safari Club II*, 878 F.3d at 320–21 (reviewing 2014 and 2015 Zimbabwe countrywide elephant findings); *Safari Club Int'l v. Jewell* (*Safari Club I*), 842 F.3d 1280, 1288 (D.C. Cir. 2016) (holding dispute over findings of limited duration to be capable of repetition and therefore justiciable). Even if we were to conclude that plaintiffs like those in *Friends of Animals v. Ashe*, 174 F. Supp. 3d 20 (D.D.C. 2016), lack standing to challenge an import permit after the subject animal has been killed, *see id.* at 31–32, 34, that logic would not defeat standing to challenge a permit regarding an animal not yet hunted. And, if plaintiffs were to contend that findings issued in the course of individual permitting decisions were in fact rules that must go through notice and comment, that claim, too, at least would present a live controversy.

The voluntary cessation exception does not apply either. Appellants argue that the Service withdrew the 2017 findings on its own initiative and that the identical language in its subsequent permit decisions shows that the Service in fact has "return[ed] to its old ways." *True the Vote, Inc. v. IRS*, 831 F.3d 551, 561 (D.C. Cir. 2016) (internal quotation and brackets omitted). The short answer is that the Service's withdrawals of the 2017 findings were not "voluntary." The 2017 findings suffered from the same defects as the 2014 and 2015 findings we considered in *Safari Club II*. And that case now makes clear that the Service cannot promulgate freestanding countrywide enhancement findings without going through notice and comment.

**B.**

**1.**

Appellants' second set of challenges is directed to the March Memo's withdrawal of more than twenty prior enhancement and non-detriment findings. In both cases, the district court concluded that appellants lack standing to challenge the withdrawal of any *positive* findings, since those findings allegedly are what harm appellants' interests by paving the way for import permits. *See Ctr. for Biological Diversity*, 369 F. Supp. 3d at 175–177; *Friends of Animals*, 373 F. Supp. 3d at 84–87. In the Center's case, the court also reasoned that the withdrawal of negative findings that govern time periods *in the past* did not plausibly cause an injury to people who hope to see animals in the future: the number of animals killed in the past is fixed, no matter how many permits the Service now grants for animals killed during that period. *See Ctr. for Biological Diversity*, 369 F. Supp. 3d at 178–79. Nonetheless, the court concluded that appellants in both cases have standing to challenge at least some of the withdrawals of negative findings. *Ctr. for Biological Diversity*, 369 F. Supp. 3d at 179; *Friends of Animals*, 373 F. Supp. 3d at 87.

Appellants before us contest only the district court's approach of evaluating the effect of each withdrawal in the March Memo individually instead of considering the Memo as a whole. But the court's approach was proper under the circumstances. "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), and the March Memo withdrew a host of similar but discrete regulatory actions with—importantly—discrete effects. And the elimination of many of those discrete actions caused no injury to appellants. Appellants offer no other argument against the district court's

conclusions that standing is lacking to challenge most of the other withdrawals, so we will not disturb those conclusions on appeal. *See Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016).

This dispute turns out to be largely academic since all agree (as do we) that appellants in each case have standing to challenge at least one of the withdrawals in the March Memo, which raises the key legal issues. Both sets of appellants undeniably have standing to challenge the withdrawal of the 2015 Zimbabwe elephant finding, a determination that was both negative and of indefinite duration. *See* Notice of Continued Suspension of Imports of Zimbabwe Elephant Trophies Taken On or After April 4, 2014, 80 Fed. Reg. 42,524, 42,527 (July 17, 2015).[3] And the Center has standing also to challenge the withdrawal of the Service's 2015 Tanzania elephant finding.[4] Appellants meet the other requirements for associational standing because the interests the organizations seek to protect are germane to their purposes, and neither the claims asserted nor the relief requested requires their members to participate in the lawsuit. *See Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013).

**2.**

---

[3] *See* No. 19-5152 J.A. at 29 (alleging finding was negative and indefinite); *id.* at 8, 82 (describing plans to see elephants in Zimbabwe); No. 19-5147 J.A. at 26 (alleging finding was negative and indefinite); *id.* at 41, 46–47, 49 (describing plans to see elephants in Zimbabwe); *id.* at 53 (describing plans to see elephants in Africa).

[4] *See* No. 19-5152 J.A. at 29 (alleging finding was negative and indefinite); *id.* at 8, 82 (describing plans to see elephants in Tanzania).

The core of appellants' cases is their contention that the Service was obligated to use § 553 of the APA—to employ notice and comment rulemaking—to withdraw its prior findings.  It is, of course, black-letter administrative law that ordinarily an agency that promulgates a rule under § 553's auspices must use the same procedure to revoke that rule. *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017).  Section 551(5) of the APA defines "rule making" to include "agency process for formulating, amending, *or repealing* a rule."  5 U.S.C. § 551(5) (emphasis added). The Supreme Court has explained that § 551 "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (noting that the APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action").  Moreover, a legislative rule issued under § 553 "modifies or adds to a legal norm based on the agency's own authority," *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015) (emphasis deleted) (internal quotation omitted), so a repeal of such a rule necessarily also modifies the law, which is why it must go through notice and comment.  But we do not see how a government action that illegally never went through notice and comment gains the same status as a properly promulgated rule such that notice and comment is required to withdraw it.

Indeed, even if an agency issues a legislative rule under § 553, we have said that it should not apply the rule in an adjudication if a court of appeals had concluded the rule is illegal.  *See Am. Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 733

(D.C. Cir. 1992).[5]   To be sure, in *American Telephone & Telegraph Co.*, we considered but did not decide whether an agency faced with a definitive judicial opinion that a legislative rule violated the Constitution or an agency's substantive statute needed to go through notice and comment to repeal the rule.   And although there is never much to be gained from comment—as opposed to a simple notice "for good cause," 5 U.S.C. § 553(b)(B)—where a rule has been declared substantively illegal, it is not necessary to decide that issue now.   That is so because, as we noted, we are faced only with the repeal of a "rule" that illegally never went through notice and comment—in other words, a "non-rule rule."   We think the logic of *American Telephone & Telegraph Co.* a fortiori leads to the conclusion that notice and comment was not required in this situation.

Friends of Animals argues, however, that our decision in *Safari Club II* was not really a rejection of the Service's prior findings because we did not "vacate" them.   *See* 878 F.3d at 335–36.   But relying on our prior decision in *Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002), we made clear that the Service's failure to engage in notice and comment rulemaking for what were de facto legislative rules was a serious violation of the APA, which meant the findings had no legal effect.   *Safari Club II*, 878 F.3d at 334–35.   And since we rejected all of Safari Club and the NRA's substantive challenges to the findings in question, there was no reason to style our disposition as a vacatur.   As noted earlier, our disposition anticipated that the

---

[5]   In that case, we had previously suggested that the rule was illegal unless it was an exercise of enforcement discretion by the FCC, a characterization the FCC subsequently disavowed.   *See Am. Tel. & Tel. Co.*, 978 F.2d at 735–36; *MCI Telecomms. Corp. v. FCC*, 765 F.2d 1186, 1190 n.4 (D.C. Cir. 1985).

Service on remand would use the procedures of § 553 to make its "findings," but we clearly did not make that approach a requirement. So the Service was back at square one and free to determine which APA procedure it would use to implement its statute and regulations. And it is well known that under the APA an agency has virtually unlimited discretion as to the procedures it uses to implement its legal/policy choices (assuming its substantive statutes don't restrict those procedures). *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 291–94 (1974).

We caution, however, that as we recently have reiterated, if only part of a rule that has gone through notice and comment is held illegal and an agency wishes to abandon the whole rule, it is obliged to use notice and comment. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83–84 (D.C. Cir. 2020). Similarly, it seems to us if a court only remanded a rule for an adequate explanation, a repeal without notice and comment would be unjustified. It is only when an agency action is struck down because the agency failed to promulgate the rule through proper procedures—as was true of the findings in *Safari Club II*—or perhaps when a court determines a legislative rule violates a statute, that § 553's full procedures would be unnecessary.

Friends of Animals raises one additional challenge to the withdrawal portions of the March Memo. In 1997, the Service issued a rule as a part of the regime governing trophy permits for African elephants that contains the following language:

> The Service will make [enhancement] findings on a periodic basis upon receipt of new information on the species' population or management. The enhancement findings for

> importation of sport-hunted elephant trophies from Botswana, Namibia, and Zimbabwe are on file in the Office of Management Authority and remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register.

Changes in List of Species in Appendices to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, 62 Fed. Reg. 44,627-01, 44,633 (Aug. 22, 1997). Friends of Animals reads these sentences to mean that the Service must publish notice in the Federal Register (though not necessarily in the form of a rule) any time it makes a change to any enhancement finding for elephants in the three countries listed. But the rule refers only to findings that were on file when the rule was issued in 1997; subsequent findings, such as the 2015 Zimbabwe elephant finding, are not included. And as we have noted, Friends of Animals has not shown that it has standing to challenge the withdrawal of the 1997 Zimbabwe elephant finding. Friends of Animals' arguments for a more expansive reading of the statute are unpersuasive.[6]

## C.

We are left with appellants' last argument, that it was unlawful for the Service to announce it would proceed in the

---

[6] Friends of Animals appears also to challenge the Service's move to future case-by-case determinations (which are not published in the federal register) as a violation of the publication language in the 1997 rule. *See Friends of Animals*, 373 F. Supp. 3d at 88. But again, the rule requires publication of changes only to those findings that were on file at the time.

future to implement the Endangered Species Act through informal adjudication. The government responds that the March Memo is not even final agency action. It never gives the March Memo an APA label, but it seems to us the Memo might best be described as in part an interpretive rule construing our decision in *Safari Club II*, *see Wheeler*, 955 F.3d at 83, and in part a policy statement setting forth the agency's plans for the procedural method it would use to implement its responsibilities under the governing statute and regulations. But in any event, because finality under the APA is no longer considered jurisdictional, *Marcum v. Salazar*, 694 F.3d 123, 128 (D.C. Cir. 2012), it is unnecessary for us to decide whether the March Memo is final agency action in light of our resolution of the merits below.

It *is* necessary, however, to determine whether appellants have standing to challenge the Service's decision to make findings on a case-by-case basis, which is rather tricky. The Center contends that the move to making findings on a case-by-case basis injures its members' concrete interests because doing so removes the possibility of flat bans on trophy import permits, thus increasing the likelihood that African wildlife will be hunted. The trouble with this theory is that it assumes the Service will make substantively different decisions depending on which procedure is used. But the same statutory obligation to make enhancement findings adheres in both contexts, and there is no reason to expect that the Service's procedural change will result in more animals being killed.

The Center also advances a theory of organizational standing to challenge the move to case-by-case determinations. Organizations can have standing in their own right, but to determine whether an organization's alleged injury is "concrete and demonstrable" we are obliged to

consider whether the agency action injured the organization's interest and whether the organization used its resources to counteract the harm. *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (internal quotation omitted). However, harms to an organization's interests in litigation, lobbying, or pure issue advocacy do not qualify. *Id.* at 1093–94.

In the Center's case, unfortunately, all of the harms that it alleged flow from the Service's switch to case-by-case determinations implicate the Center's interests in advocacy, participating in administrative proceedings, and lobbying. As the Center and its members put it, the move to case-by-case determinations will require them to expend more time and resources tracking permit decisions in hopes of commenting on and influencing them. No. 19-5152 J.A. at 12, 57–58, 73. And getting information to the Service to foster reasoned decisionmaking will be more difficult. *Id.* at 58. The Center argues on appeal that it also has interests in educating its members and the public, which will be impaired by the Service's choice not to use notice-and-comment rulemaking. But this is too little too late; the harms the Center actually articulated in its pleadings to support these challenges are not concrete under our precedent.

Friends of Animals, on the other hand, alleged from the outset that its organizational interest in educating the public would be impaired by the Service's move to case-by-case determinations. The organization's president stated that it "reports on the negative impacts of trophy hunting as well as [its] progress in addressing this issue through its magazine *ActionLine*, its website, education presentations to professional associations, and outreach to other media outlets." No. 19-5147 J.A. at 51. Friends of Animals then explained how the Service's use of case-by-case

decisionmaking would harm those interests, as "it is critical" to the organization's educational work "to have up-to-date information" on the Service's policies. *Id.* at 57. The organization accordingly has expended additional resources to access the necessary information. *Id.* At the pleading stage, those allegations suffice to establish Friends of Animals' standing to challenge the Service's decision to make findings on a case-by-case basis. *See People for the Ethical Treatment of Animals*, 797 F.3d at 1094–95.[7]

As to the merits, Friends of Animals understandably has not challenged the March Memo on the basis that the Service was obligated by the APA to implement its statutory directives through rulemaking rather than through informal adjudication. That argument would of course face an uphill climb, since, as we noted, an agency has broad discretion to choose whether to use rulemaking or adjudication—assuming both options are authorized by the agency's organic statutes. Instead, Friends of Animals contends that a provision of the Endangered Species Act allows the Service to make enhancement findings only through rulemaking:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue **such regulations** as he deems necessary and advisable to provide for the conservation of such species. The Secretary may **by regulation** prohibit with respect to any threatened species any act prohibited under

---

[7] The Service resists this conclusion on the ground that no statute grants Friends of Animals a concrete interest in the information it seeks. But for better or worse, that ship has sailed. *See People for the Ethical Treatment of Animals*, 797 F.3d at 1104 (Millett, J., dubitante).

> section 1538(a)(1) of this title, in the case of fish or wildlife . . . .

16 U.S.C. § 1533(d) (emphases added). Friends of Animals reads the text above to require rulemaking at every regulatory step of whatever regime the Secretary creates to protect threatened species. But the Act gives the Secretary broad authority to issue such regulations "as he deems necessary and advisable," *id.*, and nothing in the provision at issue prevents him from creating rules that in turn make use of subsidiary adjudications.[8]

\* \* \*

The judgments of the district court are affirmed.

*So ordered*.

---

[8] Friends of Animals also contends that the Service's move to making findings on a case-by-case basis was itself a legislative rule that required notice-and-comment rulemaking. But as Safari Club and the NRA point out, Friends of Animals did not raise that challenge in its complaint, which likely is why the district court did not address it. We will not do so in the first instance.